MARK F. HAZELWOOD, # 136521
DIRK D. LARSEN, # 246028
LOW, BALL & LYNCH
505 Montgomery Street, 7th Floor
San Francisco, California 94111-2584
Telephone: (415) 981-6630
Facsimile: (415) 982-1634
Email: mhazelwood@lowball.com
     dlarsen@lowball.com

Attorneys for Defendants
SILICON VALLEY ANIMAL CONTROL
AUTHORITY, AL DAVIS, ANTJE MORRIS
AND CITY OF CAMPBELL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE

| | |
|---|---|
| LEE JACKSON and KENNETH JACKSON,<br><br>    Plaintiffs,<br><br>v.<br><br>SILICON VALLEY ANIMAL CONTROL AUTHORITY, CITY OF SANTA CLARA, CITY OF CAMPBELL, HUMANE SOCIETY SILICON VALLEY DOES 1 TO 20,<br><br>    Defendants. | Case No. C07 05667 RS<br><br>DECLARATION OF DIRK D. LARSEN IN SUPPORT OF DEFENDANTS SILICON VALLEY ANIMAL CONTROL AUTHORITY, AL DAVIS, ANTJE MORRIS AND CITY OF CAMPBELL'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT<br><br>Date:     September 3, 2008<br>Time:    9:30 a.m.<br>Courtroom: 4, 5th Floor<br>Judge:   Hon. Richard Seeborg |

I, DIRK D. LARSEN, declare as follows:

    1.    I have personal knowledge of the following facts, and could and would testify competently thereto if called upon to do so.

    2.    I am an attorney at law duly licensed to practice before all courts of the State of California and before the U.S. District Court for the Northern District of California, and am an associate employed by the law firm of Low, Ball & Lynch, attorneys of record herein for defendants SILICON VALLEY ANIMAL CONTROL AUTHORITY, AL DAVIS, ANTJE MORRIS and CITY OF CAMPBELL

1     3.     A true and correct copy of plaintiffs KENNETH JACKSON and LEE JACKSON's first

2     amended complaint in this matter, filed on September 24, 2007, is attached hereto as Exhibit 1 and

3     incorporated by this reference.

4     4.     A true and correct copy of the cited portions of the transcript of the deposition of plaintiff

5     Kenneth Jackson, taken in this action on June 11, 2008, is attached hereto as Exhibit 2 and incorporated

6     by this reference.

7     5.     A true and correct copy of the cited portions of the transcript of the deposition of plaintiff

8     Lee Jackson, taken in this action on June 11, 2008, is attached hereto as Exhibit 3 and incorporated by

9     this reference.

10     I swear under penalty of perjury under the laws of the State of California that the foregoing is

11     true and correct to the best of my own personal knowledge.

12

13     Executed this 29th day of July, 2008, in San Francisco, California.

14

15     _____

16     DIRK D. LARSEN

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

PLD-PI-001

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Stuart M. Wilson<br>SBN 94633<br>1671 The Alameda, Suite 300<br>San Jose, California 95126<br>TELEPHONE NO: (408) 293-8400    FAX NO. *(Optional)*: (408) 293-0714<br>E-MAIL ADDRESS *(Optional)*:<br>ATTORNEY FOR *(Name)*:  Plaintiffs | ENDORSED<br>2007 SEP 24  P 3: 23 |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  Santa Clara
STREET ADDRESS: 191 North First Street
MAILING ADDRESS: San Jose, California 95113
CITY AND ZIP CODE:
BRANCH NAME: Downtown - Unlimited Jurisdiction

PLAINTIFF:  Lee Jackson and Kenneth Jackson

DEFENDANT:  Silicon Valley Animal Control Authority, City of Santa
Clara, City of Campbell, Humane Society

☑ DOES 1 TO  20   Silicon Valley, Al Davis and A. Morris

COMPLAINT—Personal Injury, Property Damage, Wrongful Death
☑ AMENDED *(Number)*: FIRST
Type *(check all that apply)*:
☐ MOTOR VEHICLE   ☑ OTHER *(specify)*:
☑ Property Damage    ☐ Wrongful Death
☑ Personal Injury    ☐ Other Damages *(specify)*:

Jurisdiction *(check all that apply)*:
☐ ACTION IS A LIMITED CIVIL CASE
Amount demanded     ☐ does not exceed $10,000
☐ exceeds $10,000, but does not exceed $25,000
☑ ACTION IS AN UNLIMITED CIVIL CASE (exceeds $25,000)
☐ ACTION IS RECLASSIFIED by this amended complaint
☐ from limited to unlimited
☐ from unlimited to limited

CASE NUMBER:
1-07-CV-079050

1. Plaintiff *(name or names)*: Lee Jackson and Kenneth Jackson
   alleges causes of action against defendant *(name or names)*: Silicon Valley Animal Control Authority, City of
   Santa Clara, City of Campbell, Humane Society    Silicon Valley, Al Davis and A. Morris
2. This pleading, including attachments and exhibits, consists of the following number of pages:  13 pages total.
3. Each plaintiff named above is a competent adult
   a. ☐ except plaintiff *(name)*:
      (1) ☐ a corporation qualified to do business in California
      (2) ☐ an unincorporated entity *(describe)*:
      (3) ☐ a public entity *(describe)*:
      (4) ☐ a minor   ☐ an adult
         (a) ☐ for whom a guardian or conservator of the estate or a guardian ad litem has been appointed
         (b) ☐ other *(specify)*:
      (5) ☐ other *(specify)*:
   b. ☐ except plaintiff *(name)*:
      (1) ☐ a corporation qualified to do business in California
      (2) ☐ an unincorporated entity *(describe)*:
      (3) ☐ a public entity *(describe)*:
      (4) ☐ a minor   ☐ an adult
         (a) ☐ for whom a guardian or conservator of the estate or a guardian ad litem has been appointed
         (b) ☐ other *(specify)*:
      (5) ☐ other *(specify)*:

☐ Information about additional plaintiffs who are not competent adults is shown in Attachment 3.

Form Approved for Optional Use<br>
Judicial Council of California<br>
PLD-PI-001 [Rev. January 1, 2007]

**COMPLAINT—Personal Injury, Property<br>Damage, Wrongful Death**

Page 1 of 3<br>
Code of Civil Procedure, § 425.12<br>
www.courtinfo.ca.gov

American LegalNet, Inc.<br>
www.FormsWorkflow.com

SHORT TITLE:
Jackson v. Silcon Valley Animal Control Authority

PLD-PI-001

CASE NUMBER:
1-07-CV-079050

4. ☐ **Plaintiff** *(name):*

is doing business under the fictitious name *(specify):*

and has complied with the fictitious business name laws.

5. Each defendant named above is a natural person
   a. ☑ **except** defendant *(name):* Silicon Valley / Animal Control Authority
      (1) ☐ a business organization, form unknown
      (2) ☐ a corporation
      (3) ☐ an unincorporated entity *(describe):*

      (4) ☑ a public entity *(describe):*
          Form Unknown
      (5) ☐ other *(specify):*

   c. ☑ **except** defendant *(name):* City of Campbell
      (1) ☐ a business organization, form unknown
      (2) ☐ a corporation
      (3) ☐ an unincorporated entity *(describe):*

      (4) ☑ a public entity *(describe):*
          City
      (5) ☐ other *(specify):*

   b. ☑ **except** defendant *(name):* City of Santa Clara
      (1) ☐ a business organization, form unknown
      (2) ☐ a corporation
      (3) ☐ an unincorporated entity *(describe):*

      (4) ☑ a public entity *(describe):*
          City
      (5) ☐ other *(specify):*

   d. ☑ **except** defendant *(name):* Humane Society Silicon Valley
      (1) ☑ a business organization, form unknown
      (2) ☐ a corporation
      (3) ☐ an unincorporated entity *(describe):*

      (4) ☐ a public entity *(describe):*

      (5) ☐ other *(specify):*

   ☐ Information about additional defendants who are not natural persons is contained in Attachment 5.

6. The true names of defendants sued as Does are unknown to plaintiff.
   a. ☑ Doe defendants *(specify Doe numbers):* 1 to 10 _____ were the agents or employees of other
      named defendants and acted within the scope of that agency or employment.
   b. ☑ Doe defendants *(specify Doe numbers):* 11 to 20 _____ are persons whose capacities are unknown to
      plaintiff.

7. ☐ Defendants who are joined under Code of Civil Procedure section 382 are *(names):*

8. This court is the proper court because
   a. ☐ at least one defendant now resides in its jurisdictional area.
   b. ☐ the principal place of business of a defendant corporation or unincorporated association is in its jurisdictional area.
   c. ☑ injury to person or damage to personal property occurred in its jurisdictional area.
   d. ☐ other *(specify):*

9. ☑ Plaintiff is required to comply with a claims statute, **and**
   a. ☑ has complied with applicable claims statutes, **ЯK** pursuant to Govt. Code 910, et seq.
   b. ☐ is excused from complying because *(specify):*

PLD-PI-001 [Rev. January 1, 2007]

COMPLAINT—Personal Injury, Property
Damage, Wrongful Death

Page 2 of 3

PLD-PI-001

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Jackson v. Silcon Valley Animal Control Authority | 1-07-CV-079050 |

10. The following causes of action are attached and the statements above apply to each *(each complaint must have one or more causes of action attached):*
   a. ☐ Motor Vehicle
   b. ☐ General Negligence
   c. ☑ Intentional Tort
   d. ☐ Products Liability
   e. ☐ Premises Liability
   f. ☑ Other *(specify):*

     **Exemplary Damages**

11. Plaintiff has suffered
   a. ☐ wage loss
   b. ☑ loss of use of property
   c. ☑ hospital and medical expenses
   d. ☑ general damage
   e. ☑ property damage
   f. ☐ loss of earning capacity
   g. ☑ other damage *(specify):*

     **Other damage not known at this time**

12. ☐ The damages claimed for wrongful death and the relationships of plaintiff to the deceased are
   a. ☐ listed in Attachment 12.
   b. ☐ as follows:

13. The relief sought in this complaint is within the jurisdiction of this court.

14. **Plaintiff prays** for judgment for costs of suit; for such relief as is fair, just, and equitable; and for
   a. (1) ☑ compensatory damages
      (2) ☑ punitive damages
   The amount of damages is *(in cases for personal injury or wrongful death, you must check (1)):*
   (1) ☑ according to proof
   (2) ☐ in the amount of: $

15. ☐ The paragraphs of this complaint alleged on information and belief are as follows *(specify paragraph numbers):*

Date: September 24, 2007

Stuart M. Wilson
_____
(TYPE OR PRINT NAME)

▶ *Stuart M. Wilson*
_____
(SIGNATURE OF PLAINTIFF OR ATTORNEY)

**COMPLAINT—Personal Injury, Property
Damage, Wrongful Death**

| SHORT TITLE: | | CASE NUMBER |
|---|---|---|
| Jackson v. Silicon Valley Animal Control Authority | | 1-07-CV-079050 |

PLD-PI-001(3)

FIRST _____ **CAUSE OF ACTION—Intentional Tort**    Page    4 ____
    (number)

ATTACHMENT TO ☑ Complaint    ☐ Cross - Complaint

    *(Use a separate cause of action form for each cause of action.)*

IT-1. Plaintiff *(name)*:  Lee Jackson and Kenneth Jackson

alleges that defendant *(name)*:  Silicon Valley Animal Control Authority, City of Santa Clara, Al Davis and
                                                                        A. Morris

    ☑ Does  1 _____    to    20 _____

was the legal (proximate) cause of damages to plaintiff. By the following acts or omissions to act, defendant intentionally
caused the damage to plaintiff
on *(date)* December 19, 2005
at *(place)* Santa Clara, California

*(description of reasons for liability)*:

Defendants unlawfully entered Plaintiff's motorhome, unlawfully seized Plaintiffs' pet animals,
unlawfully detained Plaintiffs and assaulted and battered Lee Jackson, causing Plaintiffs severe
mental, emotional and physical harm and depriving them of their property, pet animals in violation of
their rights under the U.S. Constitution, Amendment 4 and California Constitution, Article 1, Section
13.

Form Approved for Optional Use
Judicial Council of California
PLD-PI-001(3) [Rev. January 1, 2007]

**CAUSE OF ACTION–Intentional Tort**

Page 1 of 1
Code of Civil Procedure, § 425.12
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

PLD-PI-001(3)

| SHORT TITLE: | CASE NUMBER |
|---|---|
| Jackson v. Silicon Valley Animal Control Authority | I-07-CV-079050 |

SECOND _____          **CAUSE OF ACTION—Intentional Tort**          Page ____ 5 ____
(number)

ATTACHMENT TO   [✓] Complaint      [ ] Cross - Complaint

*(Use a separate cause of action form for each cause of action.)*

IT-1. Plaintiff *(name)*:  Lee Jackson and Kenneth Jackson

alleges that defendant *(name)*:  City of Campbell

[✓] Does  1 _____  to  20 _____

was the legal (proximate) cause of damages to plaintiff. By the following acts or omissions to act, defendant intentionally
caused the damage to plaintiff
on *(date)* December 22, 2005
at *(place)* Santa Clara, California

*(description of reasons for liability):*

Defendant unlawfully conducted a post-seizure hearing in which Defendant found that the seizure of
Plaintiffs' property on 12-19-05 was lawful.  Said finding was a denial of the due process rights of
Plaintiffs and was an abuse of discretion violating Plaintiff's rights to a fair due process hearing.

Page 1 of 1

Form Approved for Optional Use
Judicial Council of California
PLD-PI-001(3) [Rev. January 1, 2007]

**CAUSE OF ACTION–Intentional Tort**

Code of Civil Procedure, § 425.12
*www.courtinfo.ca.gov*

American LegalNet, Inc.
www.FormsWorkflow.com

PLD-PI-001(3)

| SHORT TITLE: | CASE NUMBER |
|---|---|
| Jackson v. Silicon Valley Animal Control Authority | I-07-CV-079050 |

<u>THIRD</u>                     **CAUSE OF ACTION—Intentional Tort**          Page    6
    (number)

ATTACHMENT TO    ☑ Complaint     ☐ Cross - Complaint

*(Use a separate cause of action form for each cause of action.)*

IT-1. Plaintiff *(name)*: Lee Jackson and Kenneth Jackson

   alleges that defendant *(name)*:  Silicon Valley Animal Control Authority and City of Santa Clara

        ☑ Does  1          to   20

was the legal (proximate) cause of damages to plaintiff. By the following acts or omissions to act, defendant intentionally
caused the damage to plaintiff
on *(date)*December 19, 2005
at *(place)*Santa Clara, California

*(description of reasons for liability)*:

Defendants negligently hired, trained and supervised employees including A. Morris, Al Davis, and
others not known by name who participated in the events surrounding the unlawful seizure of
Plaintiffs' pet animals on 12-19-05.

Page 1 of 1

Form Approved for Optional Use
Judicial Council of California
PLD-PI-001(3) [Rev. January 1, 2007]                    **CAUSE OF ACTION–Intentional Tort**                    Code of Civil Procedure, § 425.12
www.courtinfo.ca.gov

American LegalNet, Inc
www.FormsWorkflow.com

PLD-PI-001(3)

| SHORT TITLE: | CASE NUMBER |
|---|---|
| Jackson v. Silicon Valley Animal Control Authority | 1-07-CV-079050 |

FOURTH_____          **CAUSE OF ACTION—Intentional Tort**          Page    7_____
    (number)

ATTACHMENT TO   ☑ Complaint      ☐ Cross - Complaint

*(Use a separate cause of action form for each cause of action.)*

IT-1. Plaintiff *(name)*:  Lee Jackson and Kenneth Jackson

alleges that defendant *(name)*:  Silicon Valley Animal Control Authority, City of Santa Clara, Al Davis and
                                                                                                A. Morris

☑ Does  1_____   to   20_____

was the legal (proximate) cause of damages to plaintiff. By the following acts or omissions to act, defendant intentionally
caused the damage to plaintiff
on *(date)* December 19, 2005
at *(place)* Santa Clara, California

*(description of reasons for liability)*:

Defendants unlawfully entered Plaintiff's motorhome, unlawfully seized Plaintiffs' pet animals,
unlawfully detained Plaintiffs and assaulted and battered Lee Jackson, causing Plaintiffs severe
mental, emotional and physical harm and depriving them of their property, pet animals in violation of
their rights under the U.S. Constitution, Amendment 4 and California Constitution, Article 1, Section
13, thereby negligently inflicting severe emotional and mental suffering and distress upon the
Plaintiffs.

Form Approved for Optional Use
Judicial Council of California
PLD-PI-001(3) [Rev. January 1, 2007]

**CAUSE OF ACTION–Intentional Tort**

Page 1 of 1
Code of Civil Procedure, § 425.12
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

| | PLD-PI-001(3) |
|---|---|
| SHORT TITLE:<br>Jackson v. Silicon Valley Animal Control Authority | CASE NUMBER<br>1-07-CV-079050 |

FIFTH _____    **CAUSE OF ACTION—Intentional Tort**    Page ___8___
_(number)_

ATTACHMENT TO    [✓] Complaint    [ ] Cross - Complaint

*(Use a separate cause of action form for each cause of action.)*

IT-1. Plaintiff *(name)*:  Lee Jackson and Kenneth Jackson

alleges that defendant *(name)*:  Silicon Valley Animal Control Authority, City of Santa Clara, Al Davis and
A. Morris

[✓] Does  1 _____  to  20 _____

was the legal (proximate) cause of damages to plaintiff. By the following acts or omissions to act, defendant intentionally
caused the damage to plaintiff
on *(date)* December 19, 2005
at *(place)* Santa Clara, California

*(description of reasons for liability):*

Defendants unlawfully entered Plaintiff's motorhome, unlawfully seized Plaintiffs' pet animals,
unlawfully detained Plaintiffs and assaulted and battered Lee Jackson, causing Plaintiffs severe
mental, emotional and physical harm and depriving them of their property, pet animals in violation of
their rights under the U.S. Constitution, Amendment 4 and California Constitution, Article 1, Section
13.  Said acts constitute assault and battery in violation of Penal Code sections 241 and 242.

Form Approved for Optional Use
Judicial Council of California
PLD-PI-001(3) [Rev. January 1, 2007]    **CAUSE OF ACTION–Intentional Tort**    Page 1 of 1
Code of Civil Procedure, § 425.12
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

PLD-PI-001(3)

| SHORT TITLE: | CASE NUMBER |
|---|---|
| Jackson v. Silicon Valley Animal Control Authority | 1-07-CV-079050 |

SIXTH _____ **CAUSE OF ACTION—Intentional Tort**    Page _____9_____
_(number)_

ATTACHMENT TO   ☑ Complaint    ☐ Cross - Complaint

*(Use a separate cause of action form for each cause of action.)*

IT-1. Plaintiff *(name)*: Lee Jackson and Kenneth Jackson

alleges that defendant *(name)*: Silicon Valley Animal Control Authority, City of Santa Clara, Al Davis and
A. Morris

☑ Does 1 _____ to 20 _____

was the legal (proximate) cause of damages to plaintiff. By the following acts or omissions to act, defendant intentionally caused the damage to plaintiff
on *(date)* December 19, 2005
at *(place)* Santa Clara, California

*(description of reasons for liability):*

Defendants unlawfully entered Plaintiff's motorhome, unlawfully seized Plaintiffs' pet animals, unlawfully detained Plaintiffs and assaulted and battered Lee Jackson, causing Plaintiffs severe mental, emotional and physical harm and depriving them of their property, pet animals in violation of their rights under the U.S. Constitution, Amendment 4 and California Constitution, Article 1, Section 13.  By said acts Defendants intentionally inflicted severe emotional and mental suffering and distress upon Plaintiffs.

Page 1 of 1

Form Approved for Optional Use
Judicial Council of California
PLD-PI-001(3) [Rev. January 1, 2007]

**CAUSE OF ACTION–Intentional Tort**

Code of Civil Procedure, § 425.12
*www.courtinfo.ca.gov*

American LegalNet, Inc.
*www.FormsWorkflow.com*

| SHORT TITLE: | CASE NUMBER |
|---|---|
| Jackson v. Silicon Valley Animal Control Authority | 1-07-CV-079050 |

PLD-PI-001(3)

SEVENTH _____    CAUSE OF ACTION—Intentional Tort    Page ____10____
(number)

ATTACHMENT TO  [✓] Complaint    [ ] Cross - Complaint

*(Use a separate cause of action form for each cause of action.)*

IT-1. Plaintiff *(name)*: Lee Jackson and Kenneth Jackson

alleges that defendant *(name)*: Silicon Valley Animal Control Authority, City of Santa Clara, Al Davis
and A. Morris

[✓] Does 1 _____ to 20 _____

was the legal (proximate) cause of damages to plaintiff. By the following acts or omissions to act, defendant intentionally
caused the damage to plaintiff
on *(date)* December 19, 2005
at *(place)* Santa Clara, California

*(description of reasons for liability):*

Defendants unlawfully entered Plaintiff's motorhome, unlawfully seized Plaintiffs' pet animals,
unlawfully detained Plaintiffs and assaulted and battered Lee Jackson, causing Plaintiffs severe
mental, emotional and physical harm and depriving them of their property, pet animals in violation of
their rights under the U.S. Constitution, Amendment 4 and California Constitution, Article 1, Section
13. Plaintiffs were the lawful owners of said pet animals and were entitled to possession of the
animals. By seizing the pet animals Defendants unlawfully converted the pet animals to their use in
violation of Penal Code section 597.1(g).

Form Approved for Optional Use
Judicial Council of California
PLD-PI-001(3) [Rev. January 1, 2007]

**CAUSE OF ACTION–Intentional Tort**

Code of Civil Procedure, § 425.12
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

PLD-PI-001(3)

| SHORT TITLE:<br>Jackson v. Silicon Valley Animal Control Authority | CASE NUMBER<br>1-07-CV-079050 |
|---|---|

<u>EIGHTH</u>          **CAUSE OF ACTION—Intentional Tort**          Page ___11___
(number)

ATTACHMENT TO  ☑ Complaint      ☐ Cross - Complaint

*(Use a separate cause of action form for each cause of action.)*

IT-1. Plaintiff *(name)*: Lee Jackson and Kenneth Jackson

alleges that defendant *(name)*: Silicon Valley Animal Control Authority, City of Santa Clara, Al Davis  and
A. Morris

☑ Does  1 _____  to  20 _____

was the legal (proximate) cause of damages to plaintiff. By the following acts or omissions to act, defendant intentionally
caused the damage to plaintiff
on *(date)* December 19, 2005
at *(place)* Santa Clara, California

*(description of reasons for liability)*:

Defendants unlawfully entered Plaintiff's motorhome, unlawfully seized Plaintiffs' pet animals,
unlawfully detained Plaintiffs and assaulted and battered Lee Jackson, causing Plaintiffs severe
mental, emotional and physical harm and depriving them of their property, pet animals in violation of
their rights under the U.S. Constitution, Amendment 4 and California Constitution, Article 1, Section
13. Such acts violated Plaintiffs' rights to be free of unreasonable searches and seizures under the
Fourth and Fourteenth Amendments to the U.S. Constitution and is actionable under 41 U.S.C. 1983.

Form Approved for Optional Use
Judicial Council of California
PLD-PI-001(3) [Rev. January 1, 2007]

**CAUSE OF ACTION–Intentional Tort**

Code of Civil Procedure, § 425.12
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

PLD-PI-001(3)

| SHORT TITLE: | CASE NUMBER |
|---|---|
| Jackson v. Silicon Valley Animal Control Authority | 1-07-CV-079050 |

<u>NINTH</u>           **CAUSE OF ACTION—Intentional Tort**     **Page**    <u>12</u>
    (number)

ATTACHMENT TO   ☑ Complaint    ☐ Cross - Complaint

*(Use a separate cause of action form for each cause of action.)*

IT-1. Plaintiff *(name)*:  Lee Jackson and Kenneth Jackson

     alleges that defendant *(name)*:  Humane Society Silicon Valley

                ☑ Does  <u>1</u>        to   <u>20</u>

was the legal (proximate) cause of damages to plaintiff. By the following acts or omissions to act, defendant intentionally caused the damage to plaintiff .
on *(date)* December 19, 2005
at *(place)* Santa Clara, California

*(description of reasons for liability)*:

Defendant took possession of Plaintiffs' pet animals that had been seized by the Silicon Valley Animal Control Authority and converted them to their own use.

Form Approved for Optional Use
Judicial Council of California
PLD-PI-001(3) [Rev. January 1, 2007]

**CAUSE OF ACTION–Intentional Tort**

Code of Civil Procedure, § 425.12
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

PLD-PI-001(6)

| SHORT TITLE:<br>Jackson v. Silicon Valley Animal Control Authority | CASE NUMBER:<br>1-07-CV-079050 |
|---|---|

## Exemplary Damages Attachment

Page    13

ATTACHMENT TO   [✓] Complaint   [ ] Cross - Complaint

EX-1. As additional damages against defendant *(name):*

Al Davis and A. Morris

Plaintiff alleges defendant was guilty of

[✓] malice

[✓] fraud

[✓] oppression

as defined in Civil Code section 3294, and plaintiff should recover, in addition to actual damages, damages to make an example of and to punish defendant.

EX-2. The facts supporting plaintiff's claim are as follows:

Defendants unlawfully entered Plaintiff's motorhome, unlawfully seized Plaintiffs' pet animals, unlawfully detained Plaintiffs and assaulted and battered Lee Jackson, causing Plaintiffs severe mental, emotional and physical harm and depriving them of their property, pet animals in violation of their rights under the U.S. Constitution, Amendment 4 and California Constitution, Article 1, Section 13.

EX-3. The amount of exemplary damages sought is

a. [✓] not shown, pursuant to Code of Civil Procedure section 425.10.

b. [ ] $

Page 1 of 1

# EXHIBIT 2

CERTIFIED COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---


LEE JACKSON and KENNETH JACKSON,

       Plaintiffs,

    vs.                     No. C08-05667RS

SILICON VALLEY ANIMAL CONTROL
AUTHORITY; CITY OF SANTA CLARA;
CITY OF CAMPBELL; HUMANE SOCIETY
SILICON VALLEY and DOES 1 to 20,

       Defendants.
_____/


DEPOSITION OF KENNETH JACKSON

Wednesday, June 11, 2008

ROOMIAN & ASSOCIATES
Reported by:                Certified Shorthand Reporters
MARSHA SIMPSON               225 Bush Street, Suite 348
CSR No. 2771                 San Francisco, CA 94104
                             (415) 362-5920

1                          I N D E X

2   WITNESS:   KENNETH JACKSON                         PAGE

3              Examination by Mr. Hazelwood              5

4              Examination by Ms. Nguyen               98

5              Examination by Ms. Freedman            103

6                        ---oOo---

7   EXHIBITS

8        A    Four-page Notice of Deposition            5

9        B    One-page Inventory List                  30

10       C    Eight pages of color photographs         52

11       D    Four pages of color photographs          55

12       E    One-page photograph of Justice           56

13       F    One-page photograph of Kalua             57

14       G    One-page photograph of Shalaan           57

15       H    19 pages of color photographs            58

16       I    One pageof Notice Seizure of
              Animals and Declaration of Ownership
17            or Right to Keep Animal                   76

18       J    One-page letter dated December 21,
              2005, to Mr. & Mrs. Kenneth Jackson
19            from Albert J. Davis                      78

20       K    One-page letter dated December 22,
              2005, to Mr. and Mrs. Kenneth
21            Jackson from Russ Patterson               82

22       L    Two-page Findings in Support of
              Decision Affirming Seizure and
23            Impoundment                               83

24       M    Two-page letter dated December 22,
              2005, to Mr. & Mrs. Kenneth Jackson
25            from Albert J. Davis                      91

1          BE IT REMEMBERED THAT, that, pursuant to

2     Notice of Taking Deposition, and on Wednesday, the 11th

3     day of June, 2008, commencing at the hour of 10:25 a.m.

4     thereof at 96 North Third Street, Suite 500, San Jose,

5     California, before me, MARSHA SIMPSON, a Certified

6     Shorthand Reporter in the State of California, there

7     personally appeared

8                    KENNETH JACKSON,

9     called as a witness herein, who, being by me first duly

10    sworn, was thereupon examined and testified as is

11    hereinafter set forth.

12

13

14               A P P E A R A N C E S

15         LAW OFFICE OF STUART M. WILSON, 1671 The

16    Alameda, Suite 300, San Jose, California 95126,

17    represented by STUART M. WILSON, Attorney at Law,

18    appeared as counsel on behalf of Plaintiffs.

19         LOW, BALL & LYNCH, 505 Montgomery Street,

20    Seventh Floor, San Francisco, California 94111,

21    represented by MARK F. HAZELWOOD, Attorney at Law,

22    appeared as counsel on behalf of Defendants Silicon

23    Valley Animal Control Authority and City of Campbell.

24    //

25    //

Roomian & Associates    (415) 362-5920

1            RANKIN, LANDSNESS, LAHDE, SERVERIAN & STOCK,

2    96 North Third Street, Suite 500, San Jose, California

3    95112-5572, represented by ALYSSA T. NGUYEN, Attorney at

4    Law, appeared as counsel on behalf of Defendant City of

5    Santa Clara.

6            JOSEPH COSTELLA & ASSOCIATES, 215 Lennon Lane,

7    Suite 200, Walnut Creek, California 94598, represented

8    by KARREN FREEDMAN, Attorney at Law, appeared as counsel

9    on behalf of Defendant Humane Society Silicon Valley.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      A.     I remember the approximate time but not the

2   exact date.

3      Q.     Give me your best --

4      A.     It was approximately one week before Christmas

5   in 2005.

6      Q.     All right.  It's my understanding it was

7   December 19, 2005.  Does that sound right to you?

8      A.     Yes, it does.

9      Q.     Okay.  And as of that date were you living in

10  the motorhome?

11     A.     Yes, we were.

12     Q.     And did you have the motorhome fixed at a

13  certain location at that time?

14     A.     Generally we were parked by the Safeway store

15  where I work.  We had the permission of the management

16  there.

17     Q.     What's the address of that Safeway store?

18     A.     It's called Rivermark Plaza.  I'm not sure of

19  the street address, but it's part of the plaza there.

20     Q.     Okay.  That's --

21     A.     In Santa Clara.

22     Q.     -- in Santa Clara?

23     A.     On Agnews Road and Monterey Expressway is the

24  crossroads there.

25     Q.     Now at that time were you parked on a street

1    Q.    I see.

2    A.    We were stopping there -- I don't know what

3    detail you want me to go into.

4    Q.    Go ahead, please.

5    A.    We were stopping there to stop for a moment to

6    get a Christmas gift from a lady who was going to give

7    it to us there, and then we were proceeding to a

8    veterinary clinic in Santa Cruz in our motorhome.

9    That's how I happened to remember it.

10    Q.    Okay.  So let me go back.  What were your work

11    hours at that time?

12    A.    That particular day -- they vary somewhat from

13    day-to-day.  I usually work four hours a day, and it

14    was, I believe, 8:00 to 12:00 that day.  It was either

15    8:00 to 12:00 or 7:00 to 1:00, but I think 8:00 to

16    12:00.

17    Q.    Okay.  And then did your wife pick you up at

18    work in the motorhome?

19    A.    No.  I was right there at the place of

20    business.

21    Q.    Okay.  So had you driven to work in the

22    motorhome that morning?

23    A.    No.  The motorhome is parked right there where

24    I work.

25    Q.    I see.  Where -- and forgive me.  Where is

1    where you normally keep the motorhome outside of the

2    Safeway on the street in relation to the Mervyn's Plaza?

3        A.    Usually we keep our motorhome right there at

4    the Safeway.

5        Q.    Right.  Okay.  All right.  Oh, I see.  All

6    right.  So you came out from work, the motorhome was

7    there, and then you drove off to the Mervyn's Plaza?

8        A.    Correct.  I walked out the door about ten

9    steps and got to the motorhome, and we were off and

10   running.

11       Q.    How close is Mervyn's Plaza to where you kept

12   the motorhome?

13       A.    Four miles, perhaps.

14       Q.    Okay.  All right.  And so then you parked the

15   motorhome in the parking lot of the Mervyn's Plaza?

16       A.    We were going to park it there briefly to pick

17   up a gift, and then we were leaving immediately to go

18   over the hill to Santa Cruz to the veterinary clinic.

19       Q.    Okay.  So did you actually go into the parking

20   lot?

21       A.    We drove into the parking lot.

22       Q.    Okay.  Did you park there?

23       A.    We stopped there; yes.

24       Q.    Okay.  And did you go into one of the stores

25   to get the gift?

1    Q.    All right.  And at that time you have told us

2    about the two dogs, Minnilinn and Calae?

3    A.    Calae.

4    Q.    Calae, excuse me.  How many total animals did

5    you have at that time that you were keeping inside the

6    motorhome?

7    A.    Twenty.  Two more than the previous number I

8    gave you.  The previous number I gave you was 18.  And

9    then we had those two feral cats that we had trapped

10   there.

11   Q.    Okay.  So your best estimate it was six dogs

12   and fourteen cats?

13   A.    Yes.  That would be 18, though, wouldn't it?

14   Q.    Well, six and fourteen.

15   A.    Okay.  Yeah.

16   Q.    Okay.  Actually I had a total of 21.  Why

17   don't we do this.  I'm going to -- we have marked as

18   Exhibit A the Notice of the Deposition today.  I'm going

19   to show you, just to help see if we can identify the

20   number, this is an inventory list that came from either

21   the Silicon Valley Animal Control Authority or the

22   Humane Society.  And I'm just showing this because it

23   has the names of the animals.  And I have here, there's

24   a total of 21 animals here.  So I just want you to take

25   a look at this and see if that refreshes your

1    recollection on the number.

2        A.    That's probably correct.  So I'm right on the

3    dogs.  Okay.  This is correct.

4        Q.    Okay.  All right.

5        A.    I was mistaken.

6        Q.    That's okay.  That's why I wanted to show it

7    to you, so we're right on the number.

8        A.    Other than some misspellings.  But otherwise

9    it's correct.

10       Q.    Okay.  Why don't -- we are going to mark this

11   document, this Inventory List, as Exhibit B.

12            (Exhibit B was marked for identification.)

13            MR. HAZELWOOD:  Q.  All right.  Did you and

14   your wife consider yourself the owners of all 21 of

15   these pets, of these animals?

16       A.    Yes.  Correction.  Other than those two feral

17   cats; yes.

18       Q.    All right.  And with regard to the two feral

19   cats, what was the -- were you just holding them, or

20   what was your thinking on those?

21       A.    My wife had a friend who was very interested

22   in adopting them.

23       Q.    Where had you gotten the two feral cats?

24       A.    They were in the parking lot at the Bridge

25   Bank, which is in the plaza there at Mervyn's.

1    going too fast for you?

2        Q.    You are doing great.

3        A.    Brandy and Kahlua, four years.  Shalaan, the

4    last one, seven years.  I'm really hesitant about that,

5    because I'm not that firm in my mind.  My memory is

6    really bad.

7        Q.    All right.  How about what can you tell me as

8    far as the cats?  We've gone over the two feral cats.

9        A.    Yes.

10       Q.    We know that.

11       A.    Yeah.

12       Q.    Let's go off the record for just a second.

13             (Interruption.)

14             THE WITNESS:  I can tell you one of them.

15             MR. HAZELWOOD:  Hold on a second.  Let's go

16   back on the record.  Go ahead.

17             THE WITNESS:  Talia, I can tell you, number 14

18   on the cat list, that she is about 14 years, I believe.

19             MR. HAZELWOOD:  Q.  Okay.

20       A.    But I really would be reluctant to hazard a

21   guess about the rest of them, because I don't think of

22   them so much as individuals.

23       Q.    Okay.  All right.  We'll ask Mrs. Jackson.

24       A.    She can tell you all the details.

25       Q.    Okay.  All right.  Let's go back to the

1    afternoon of December 19.  So your wife then brought out

2    the two dogs, Calae and Minnilinn; all right?

3         A.    Um-hum.

4         Q.    At that time was Minnilinn having any health

5    issues?

6         A.    Yes.

7         Q.    What were the health issues?

8         A.    We had made arrangements -- my wife had, not

9    me -- my wife had made arrangements with the

10   veterinarian to have her spayed.

11        Q.    Okay.

12        A.    And he said he would have her done shortly

13   after the first of the year, barring any unforeseen

14   medical problems.  She began having a very heavy season

15   on that particular -- the day before that -- at that

16   particular time.

17        Q.    Okay.

18        A.    That's why we had made arrangements to go

19   immediately over to Santa Cruz to have her attended to.

20        Q.    Did you have an appointment there?

21        A.    I believe so; yes.

22        Q.    And what was the facility that you were going

23   to?

24        A.    Chanticleer Veterinary Clinic in Santa Cruz.

25        Q.    Chanticleer Veterinary Clinic.  Do you know

1   what street that's on?

2       A.    Chanticleer Avenue.  It's right off Soquel.

3       Q.    Okay.  All right.  So is it correct that

4   Minnilinn was hemorrhaging, was bleeding?

5       A.    She was in season.  I don't know -- she was

6   having a very heavy season in any event.

7       Q.    Was she wearing a diaper at that time?

8       A.    My wife had a diaper on her; yes.

9       Q.    Did she have any other health issues that you

10  were aware of at that time?

11      A.    No.

12      Q.    For instance, was she having any dental

13  problems at that time that you are aware of?

14      A.    Not to my knowledge.

15      Q.    Okay.  So other than the fact that she was in

16  season, as you say, you felt she was in good health?

17      A.    Yes.

18      Q.    What were the -- in the motorhome, all of the

19  animals were kept in the motorhome; correct?

20      A.    Yes.

21      Q.    And how often were the dogs fed at that time?

22      A.    We fed them once a day.

23      Q.    What would they eat?

24      A.    Iams dog food.  I hyphen a-m-s.  Lamb and rice

25  dog food.

1    Morris had the tooth been extracted?

2         A.    I don't know.

3         Q.    Was it more than a year before?

4         A.    Yes.

5         Q.    Had you had Calae's jaw examined by a

6    veterinarian?

7         A.    I don't, I don't know.  I really don't.

8         Q.    All right.  Are you aware of Calae having any

9    problems with -- I'm sorry, is Calae a female?  Do you

10   know if it's --

11        A.    Female; yes.

12        Q.    Of course.  I'm sorry.  Whether Calae had any

13   problems with her eyesight?

14        A.    No.

15        Q.    Are you aware as to whether she had any dental

16   problems?

17        A.    No.

18        Q.    Did you feel that she was underweight at all

19   at the time of the visit from Officer Morris?

20        A.    No.

21        Q.    Okay.  So Officer Morris looks at the dogs

22   outside the motorhome?

23        A.    Those two dogs; yes.

24        Q.    How long did that take?

25        A.    A few minutes.

1      Q.     Okay.   Then what happened?

2      A.     She came —— she said I'm coming in.   I'm going

3  to look at your dogs.   You're homeless.   And she pushed

4  herself right on in.

5      Q.     Okay.   Was that the extent of the discussion?

6      A.     Yes.

7      Q.     Was there —— so is it your testimony that she

8  did not ask to come in; she just said she was?

9      A.     She did not ask.   She said I'm coming in.

10      Q.     Okay.   And did you or your wife say anything

11  in response to that?

12      A.     I didn't say anything.   I was outside.   I

13  guess my wife was outside also.

14      Q.     Right.

15      A.     My wife may have said something.   But I don't

16  recall what it was, if anything.

17      Q.     Okay.   And then what took place?

18      A.     She came out.

19      Q.     Okay.

20      A.     She came out right away.   She was only there a

21  few moments and came right on out.

22      Q.     So she went into the door of your motorhome?

23      A.     She went right on in there.

24      Q.     Did you follow her?

25      A.     No; I stayed outside.

1    A.    No, not -- no.

2    Q.    At any point during this series of events did

3    you give Officer Morris -- did you or your wife give

4    Officer Morris permission to inspect the motorhome?

5    A.    No.

6    Q.    At the time that she went in, so as of that

7    time period around one o'clock, did the motorhome have

8    the smell of urine in it?

9    A.    It could well have.

10    Q.    Can you describe for me the dimensions or the

11    size of the area that you were keeping the animals?

12    A.    Well, the motorhome is 40 feet long and

13    consists of three separate rooms.  A rear bedroom, a

14    bath, a kitchen, and a front room.  Specifically the

15    area, I couldn't quite -- I can't quite estimate that.

16    But the cats were in two large condominiums as well as a

17    medium sized condominium, and a small condominium.

18    Q.    Okay.  And in which of the rooms were the cats

19    kept in?

20    A.    Most of the cats were kept in the bedroom, the

21    master bedroom.  I guess -- we call it the master

22    bedroom, the rear bedroom.

23    Q.    Okay.

24    A.    The bed had been removed, so it was flat for

25    them.

1      Q.    And, if you know, do you know the dimensions

2   of that room?

3      A.    No, I don't.

4      Q.    Okay.  All right.  So you had two cat condos

5   in that bedroom.  Did those each have about six cats

6   inside them?

7      A.    Yes, those two did.

8      Q.    And then you had a separate condo for the

9   feral cats?

10     A.    Yes; correct.

11     Q.    And then you had a single cat that was in a

12  crate?

13     A.    No, not in a crate.  In a smaller condominium.

14     Q.    Which cat was that; do you remember?

15     A.    No, I don't.

16     Q.    Why was that cat in a separate crate, or

17  condo, excuse me?

18     A.    I don't remember.  I don't recall that.  I'm

19  trying to think the name of the cat even.

20     Q.    Okay.  And was the feral cat or feral cats,

21  were they kept in the rear bedroom also?

22     A.    Yes.  In the condominium in the rear bedroom;

23  yes.

24     Q.    Okay.  So you had the -- were all 15 cats then

25  kept in this rear bedroom?

1      A.    Yes.

2      Q.    Do you know if there was any -- I'll just

3  describe it as fecal matter, poop, what have you, on the

4  cages of -- inside these cages, of the condos at the

5  time that Officer Morris would have been inspecting

6  them?

7      A.    Yes.

8      Q.    Were there any flies or insects inside the

9  motorhome at the time that Officer Morris would have

10  been going in there?

11      A.    There were.  I want -- could I confer with

12  Mr. Wilson for just a moment?

13          MR. HAZELWOOD:  Yes, you can.  Why don't we

14  take a break.  We've been going for a while.  Take five.

15          (Recess taken.)

16          MR. HAZELWOOD:  Back on the record.

17      Q.    Mr. Jackson, at any time before December 19,

18  2005, did you feel that you and your wife were over your

19  heads in caring for these animals or that it was too

20  much?

21      A.    No.

22      Q.    Okay.  Let me show you some photographs that

23  I'll represent to you were taken by the Silicon Valley

24  Animal Control Authority.  And I just want you to look

25  at these and I'm going to ask you do these photographs

1    Silicon Valley Animal Control Authority officers then

2    went into the motorhome.  You remember one coming out

3    with a camera at some point; correct?

4        A.    Yes.

5        Q.    And then at some point then, then the officers

6    began to take the animals out?

7        A.    Yes.

8        Q.    All right.  How long did that process take?

9        A.    Oh, half an hour.  Minimum half an hour, maybe

10   an hour.  Maximum.  I was distraught, too.

11       Q.    Okay.  Did you have any discussion with the

12   officers while this was going on?

13       A.    Not the Silicon Valley officers, no, but the

14   police officer.  There was a male police officer with

15   Ms. Soto.  And he had a couple of comments to make.

16       Q.    What were those?

17       A.    I don't want any part of this is what he said.

18   I don't like being here.

19       Q.    Do you know that officer's name?

20       A.    No, I don't.

21       Q.    Can you describe him for me?

22       A.    Probably Latin.  Tall, a little heavy, 27.

23       Q.    That's an approximate age?

24       A.    Approximate age.

25       Q.    Okay.  Did you have any further conversation

1    Q.    Do you recall receiving this document at any

2  time?

3    A.    No, I don't.

4    Q.    Okay.  Have you ever seen this document

5  before?

6    A.    No, I haven't.

7    Q.    Now let's take the other portion, the

8  Declaration of Ownership or Right to Keep Animal.  Have

9  you ever seen this document before?

10    A.    Well, that's definitely my handwriting.

11    Q.    Okay.  Which -- is all of the handwriting on

12  this portion of the document under Declaration of

13  Ownership or Right to Keep Animal, is that all of your

14  handwriting?

15    A.    No; only my signature there.

16    Q.    Is that your wife's signature there also?

17    A.    Yes, it is.

18    Q.    Okay.  Do you remember seeing this document

19  before?

20    A.    No, I don't.

21    Q.    Okay.  Do you recognize the other handwriting

22  that's on this portion?

23    A.    Correct.

24    Q.    Whose is it?

25    A.    My wife's.

1     Q.    Which areas of this document has your wife's

2   handwriting?

3     A.    The upper right-hand portion of the document.

4     Q.    Okay.  Where I believe -- can you read that

5   for me?

6     A.    Please make this --

7     Q.    Hearing?

8     A.    -- hearing as soon as possible.  That's the

9   declaration of a hearing that they were going to conduct

10  or did conduct.

11    Q.    Okay.  All right.

12    A.    And I do recognize that document.

13    Q.    All right.  And you have seen it before?

14    A.    Yes.

15    Q.    And do you remember when you first received

16  this document?

17    A.    We went to the animal control place where

18  their offices were and got it there.

19    Q.    Okay.  When was that?  Again if this incident

20  takes place on December 19, when did you receive this as

21  best you recall?

22    A.    I can't specifically say that.  I don't know

23  what date it was.  I know it was later.  From the

24  document here it had to be returned to them by the 29th,

25  so --.

1      Q.    All right.  Do you recall having a hearing

2  regarding the seizure of your animals?

3      A.    Yes, I do recall a hearing; yes.

4      Q.    Did you receive this document before the

5  hearing took place?

6      A.    Yes.

7      Q.    Did you understand that this was a document so

8  that you could request a hearing?

9      A.    Yes.

10     Q.    Okay.  Why don't -- we're going to mark the

11  single page which has the document or the document

12  Notice Seizure of Animals and Declaration of Ownership

13  or Right to Keep Animal as Defendant's next in order.  I

14  think it's I.

15          (Exhibit I was marked for identification.)

16          MR. HAZELWOOD:  Q.  Sitting here today,

17  Mr. Jackson, do you recall whether you received either

18  of those two documents that we marked as Exhibit I on

19  the day that the incident occurred?

20     A.    The one I mentioned specifically earlier, yes.

21  This one here I do not recall.

22     Q.    Okay.  So the Declaration that we talked

23  about, you think you got on the day of the incident?

24     A.    Either later on the same day or the next day

25  we went over to the office.  I don't think it was the

1    same day.

2        Q.    All right.  The Notice of Seizure of Animals,

3    you don't recall seeing that before?

4        A.    I do not recall that.

5        Q.    Okay.  All right.  So then a hearing was set,

6    and my understanding is that took place three days later

7    on December 22nd, 2005.  Does that sound right to you?

8        A.    Yes.

9        Q.    Okay.  Did you receive notice either in

10   writing or by a telephone call that the hearing was

11   going to go forward?

12       A.    Yes.

13       Q.    Okay.  How did you become aware of the

14   hearing?

15       A.    I think it was by writing.

16       Q.    Okay.  Let me show you a letter from the

17   Silicon Valley Animal Control Authority to Mr. and

18   Mrs. Kenneth Jackson dated December 21, 2005.  I want to

19   ask if you have seen that letter before?

20           MS. FREEDMAN:  I'm sorry, what was the date of

21   the letter?

22           MR. HAZELWOOD:  December 21, 2005.

23           THE WITNESS:  Yes.

24           MR. HAZELWOOD:  Q.  Is this the notice that

25   you received?

1    A.    Yes.  We did receive that.

2    Q.    All right.  And did you receive this in

3  advance of the hearing?

4    A.    Yes.

5    Q.    Okay.  Let's mark that as Exhibit J.

6         (Exhibit J was marked for identification.)

7         MR. HAZELWOOD:  Q.  All right.  So then did

8  you and your wife go to the hearing?

9    A.    Yes.

10    Q.    And where was the hearing held?

11    A.    At their offices.

12    Q.    Of Silicon Valley?

13    A.    Of Silicon Valley Animal Control offices.

14    Q.    Okay.  Did both you and your wife go?

15    A.    Yes.

16    Q.    Did you have counsel with you?

17    A.    No.

18    Q.    Did you have anyone else attend on your

19  behalf?

20    A.    There were a couple of people in support of

21  us, but nobody appeared on our behalf.

22    Q.    I see.  Who was there in support?

23    A.    Mr. Mark Butler.

24    Q.    Who is he?

25    A.    He's an Assistant District Attorney, Santa

1    Clara County.

2         Q.    All right.

3         A.    And Judy Kucera.

4         Q.    Did they speak at the hearing?

5         A.    No, they did not.

6         Q.    What took place at the hearing?

7         A.    It was an in-house hearing, and there was no

8    proper judge.  There was a hearing officer from the

9    Campbell Police Department.

10        Q.    That was Captain Russ Patterson?

11        A.    Yes.

12        Q.    Why do you say he wasn't proper?

13        A.    As far as I know he's not a judge.

14        Q.    Do you have some understanding that the person

15   who is conducting the hearing or overseeing the hearing

16   has to be a judge?

17        A.    I believe he should have been; yes.

18        Q.    Who told you that?

19        A.    My wife told that to me, and somebody told

20   that to her.

21        Q.    Do you know who told her?

22        A.    No.

23        Q.    Okay.  Did you and your wife speak at the

24   hearing?

25        A.    My wife did.

1    Q.    Did you have the opportunity to speak?

2    A.    Yes.  I guess I could have.  Yes, I did ask a

3    couple of questions.

4    Q.    Did you choose to have your wife speak on your

5    behalf?

6    A.    Yes, she spoke.  Yes, she did speak.

7    Q.    All right.  How long was the hearing?

8    A.    Less than half an hour.

9    Q.    Who else was there?

10   A.    Antje Morris was there, Mr. Davis was there.

11   And the director of the Animal Control Authority.  I

12   don't know his name.

13   Q.    Dan Sazinski?  Do you recognize that name?

14   A.    Yes; that's he.

15   Q.    Anybody else there?

16   A.    No.

17   Q.    Okay.  Did you receive the decision that day

18   with regard to the hearing?

19   A.    I don't think it was the same day.  I think it

20   was maybe the next day, I think.

21   Q.    What did you understand the hearing was about?

22   A.    About whether they were going to seize our

23   animals or not.

24   Q.    Did you understand that the hearing was about

25   whether -- well, the animals had been seized; correct?

1    A.    Well, whether they were going to be kept.

2    Q.    Okay.  All right.  And is it your recollection

3  you did not receive a decision that day?

4    A.    That is my recollection; yes.

5    Q.    How did you learn about the decision?

6    A.    By mail.

7    Q.    By mail?

8    A.    (Witness nods head.)

9    Q.    Do you recall Captain Patterson advising you

10  orally at the hearing that he felt that the impoundment

11  of the animals was proper and justified?

12    A.    Yes.  Yes, I do remember that.

13    Q.    Okay.  And then did you receive a letter in

14  follow-up from Captain Patterson?

15    A.    Yes.

16    Q.    Okay.  Let me show you a letter dated

17  December 22nd, 2005, from the City of Campbell Police

18  Department.  Do you recognize that letter?

19    A.    I don't think I personally saw it, but I'm

20  sure it's accurate.

21    Q.    But you don't recall one way or the other --

22    A.    I don't recall having personally read it, but

23  I know it's accurate.

24    Q.    What's accurate?

25    A.    The letter itself.

1    cat was in?

2    A.    I would say about three feet by five feet.

3    Q.    Okay.  Number 12, litter boxes contained large

4    amounts of fecal matter.

5    A.    I do not challenge that.  I hadn't cleaned up

6    that day.

7    Q.    Number 13, the water bowls inside the cat

8    condos were either empty or barely filled with water.

9    Correct or incorrect?

10   A.    I challenge that.

11   Q.    Why?

12   A.    Because I don't believe they were.

13   Q.    Number 14, the cats appeared to have health

14   problems, shriveled ears, and missing fur.

15   A.    I don't know.  I challenge that.

16   Q.    But you don't know one way or the other?

17   A.    I don't recognize any shriveled ears at all.

18   And as far as the missing fur, I don't recognize that

19   either.

20   Q.    Okay.  Number 15, some of the cats displayed

21   signs of upper respiratory infection including sneezing

22   and discharge from the eyes and nose.

23   A.    I don't know.

24   Q.    Okay.  All right.  Let me show you a further

25   letter.  This one is from Silicon Valley Animal Control

1  sobbing, constant crying, constant daily being upset.

2    Q.    Where did she seek that treatment?

3    A.    She went to a psychologist out in Los Gatos

4  and another one here in Santa Clara.

5    Q.    Do you know the names?

6    A.    No, I don't.

7    Q.    How many visits did she have?

8    A.    Three or four at each place.

9    Q.    All right.

10   A.    You asked about the soreness possibly.  She

11  had soreness for some period of time around her neck

12  there and on her wrist, too.

13   Q.    Okay.  How long did she have that?

14   A.    The one on the neck I think about four weeks.

15  The soreness on the neck I think about four weeks.  And

16  on the wrist longer than that, but I can't be specific.

17   Q.    Did she have any medical treatment of any kind

18  for the neck or the wrist?

19   A.    No.

20   Q.    All right.  Do you know what came of the

21  visits to the psychologist?  Psychologists?

22   A.    Psychologists.  Not psychiatrists.  She just

23  -- she was comfortable during the visits, but it didn't

24  really help -- neither psychologist really helped her at

25  all.  They were sympathetic, you know, but it didn't

1      R E P O R T E R ' S   C E R T I F I C A T E

2

3          I, MARSHA SIMPSON, a Certified Shorthand

4      Reporter of the State of California, hereby certify that

5      the witness in the foregoing deposition was by me duly

6      sworn to tell the truth, the whole truth and nothing but

7      the truth in the within-entitled cause; that said

8      deposition was taken at the time and place therein

9      stated; that the testimony of the said witness was

10     reported by me, a duly certified shorthand reporter, and

11     was thereafter transcribed by me or under my direction

12     into typewriting; and that the witness was given an

13     opportunity to read and, if necessary, correct said

14     deposition and to subscribe the same.

15         I FURTHER CERTIFY that I am not of counsel or

16     attorney for either or any of the parties in the

17     foregoing deposition and caption named, or in any way

18     interested in the outcome of the cause named in said

19     caption.

20         IN WITNESS WHEREOF, I have hereunto set my

21     hand this 12th day of June, 2008.

22

23                         MARSHA SIMPSON
                           Certified Shorthand Reporter
24                         Certificate No. 2771
                           State of California
25

Roomian & Associates    (415) 362-5920

**EXHIBIT 3**

CERTIFIED COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---


LEE JACKSON and KENNETH JACKSON,

      Plaintiffs,

    vs.                   No. C08-05667RS

SILICON VALLEY ANIMAL CONTROL
AUTHORITY; CITY OF SANTA CLARA;
CITY OF CAMPBELL; HUMANE SOCIETY
SILICON VALLEY and DOES 1 to 20,

      Defendants.

_____/



DEPOSITION OF LEOLA JACKSON

Wednesday, June 11, 2008

VOLUME I

ROOMIAN & ASSOCIATES
Reported by:      Certified Shorthand Reporters
MARSHA SIMPSON    225 Bush Street, Suite 348
CSR No. 2771     San Francisco, CA 94104
                (415) 362-5920

1                           I N D E X

2      WITNESS:   LEOLA JACKSON                          PAGE

3              Examination by Mr. Hazelwood               5

4                       ---oOo---

5      EXHIBITS

6         N     Four-page Notice of Deposition          59

7         O     One-page color photograph               69

8         P     One-page black and white photograph     70

9         Q     One-page color photograph               70

10        R     One-page color photograph               71

11        S     One-page color photograph               72

12        T     One-page color photograph               72

13        U     One-page color photograph               73

14        V     One-page color photograph               73

15        W     One-page color photograph               73

16        X     One-page color photograph               74

17        Y     One-page color photograph               75

18        Z     One-page color photograph               75

19        AA    One-page color photograph               76

20        BB    One-page color photograph               76

21        CC    One-page color photograph               77

22                      ---oOo---

23

24

25

1    BE IT REMEMBERED THAT, that, pursuant to

2  Notice of Taking Deposition, and on Wednesday, the 11th

3  day of June, 2008, commencing at the hour of 2:10 p.m.

4  thereof at 96 North Third Street, Suite 500, San Jose,

5  California, before me, MARSHA SIMPSON, a Certified

6  Shorthand Reporter in the State of California, there

7  personally appeared

8                    LEOLA JACKSON,

9  called as a witness herein, who, being by me first duly

10  sworn, was thereupon examined and testified as is

11  hereinafter set forth.

12

13

14              A P P E A R A N C E S

15    LAW OFFICE OF STUART M. WILSON, 1671 The

16  Alameda, Suite 300, San Jose, California 95126,

17  represented by STUART M. WILSON, Attorney at Law,

18  appeared as counsel on behalf of Plaintiffs.

19    LOW, BALL & LYNCH, 505 Montgomery Street,

20  Seventh Floor, San Francisco, California 94111,

21  represented by MARK F. HAZELWOOD, Attorney at Law,

22  appeared as counsel on behalf of Defendants Silicon

23  Valley Animal Control Authority and City of Campbell.

24  //

25  //

1        RANKIN, LANDSNESS, LAHDE, SERVERIAN & STOCK,

2    96 North Third Street, Suite 500, San Jose, CA

3    95112-5572, represented by ALYSSA T. NGUYEN, Attorney at

4    Law, appeared as counsel on behalf of Defendant City of

5    Santa Clara.

6        JOSEPH COSTELLA & ASSOCIATES, 215 Lennon Lane,

7    Suite 200, Walnut Creek, California 94598, represented

8    by KARREN FREEDMAN, Attorney at Law, appeared as counsel

9    on behalf of Defendant Humane Society Silicon Valley.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    A.    Okay.

2    Q.    Good.  All right.  Let me ask you some

3    background questions.  Can you give us your date of

4    birth, please?

5    A.    5-15-21.

6    Q.    And where were you born?

7    A.    Mount Ayr, Iowa.

8    Q.    And Ayr is A-y-r?

9    A.    A-y-r.

10    Q.    All right.  And my understanding from the

11    deposition of your husband earlier today is that you and

12    Ken have been married for over 43 years?

13    A.    Since 9-11-66.

14    Q.    All right.  And you have no children; correct?

15    A.    No.

16    Q.    All right.  And where do you currently reside?

17    A.    Well, we're temporarily in our motorhome.

18    Q.    And that's -- what is the year and make and

19    model of that motorhome?

20    A.    1996 Bounder.

21    Q.    Okay.

22    A.    Thirty-eight and a half foot.  It's the

23    biggest they make.

24    Q.    Okay.  How long have you had the motorhome?

25    A.    Since 2000.

1     Q.     And did you purchase that from Mr. Gonzalez?

2     A.     Yes.

3     Q.     Have you been using the motorhome as your

4  residence since 2000?

5     A.     Yes.

6     Q.     And where do you keep the motorhome at this

7  time?

8     A.     Well, my husband works part-time, as you know,

9  so we're there when he's working.  And sometimes if we

10  don't have something else to do, we stay there overnight

11  because of the cost of gasoline today.  So it depends

12  upon what our plans are as to where we are and where we

13  aren't.

14     Q.     My understanding is that he's been working for

15  the past four months or so at the Safeway store at

16  Rivermark Plaza in Santa Clara?

17     A.     Four months?  He'll be there three years in

18  September.

19     Q.     Okay.  That was my bad.  That's right.

20     A.     He started to work there September 25th, 2005.

21     Q.     Okay.  Prior to that he worked at Wal-Mart?

22     A.     He worked at Wal-Mart from -- he was there

23  nine and a half years.  He left there in February of

24  2005.  February 25th, as a matter of fact, the same day.

25  And the month.  February 25th, 2005, he left Wal-Mart.

1    He'd been there nine and a half years.  He had started

2    in June.

3                 MR. WILSON:  Okay.  He's not asking about

4    that.

5                 MR. HAZELWOOD:  Q.  Okay.  So the same day

6    that he stopped working at Wal-Mart he began working at

7    Safeway?

8         A.    No.  He quit working --

9         Q.    I'm sorry.

10        A.    He quit working at Wal-Mart February 25th of

11   2005.

12        Q.    All right.

13        A.    He started at Safeway September 25th, 2005.

14        Q.    I got you.  All right.  Where are you

15   keeping -- where do you keep the motorhome these days?

16        A.    I already told you.

17        Q.    All right, ma'am.

18        A.    At Safeway when he's working there, and

19   sometimes we stay over there if we don't have other

20   plans to do something else.  It depends upon our daily

21   schedule, Mr. Hazelwood, as to where we go and where we

22   don't and what we do and what we don't do.

23        Q.    All right.  Well, I will tell you your husband

24   told us that the motorhome has been at the same location

25   for the past four months.  Is that incorrect?

1   even write down the correct names or the coloring of

2   many of them.

3       Q.    Was she taking notes while you were doing

4   this?

5       A.    She was writing it all down, Mr. Hazelwood.

6       Q.    Okay.  How do you know she didn't take it down

7   correctly?

8       A.    Because when I got the things just recently

9   from the, through my attorney, they weren't correct.

10      Q.    Okay.  All right.  At any point in time while

11  Officer Morris was in your motorhome before you gave her

12  the names did you object to her being in the motorhome?

13      A.    I didn't take any time to talk to her.  I was

14  more interested in just letting her see them.

15      Q.    All right.  Did your husband have any

16  conversation with Officer Morris while Officer Morris

17  was in the motorhome before you gave her the names?

18      A.    To my knowledge, no, I don't remember him —— I

19  don't know.  I don't remember him saying anything.  I

20  was very upset about Minni-Linn's health.  That was more

21  important to me at the time.  I was worried about her.

22  I wanted to get going.

23      Q.    Okay.  So you were outside and you were giving

24  the names to Officer Morris.  Then what happened?

25      A.    Then she got on the telephone, and all of a

1   sudden everything came.  Trucks, animal control, police

2   department, everybody, all at once.

3       Q.    All right.  So that would have been

4   representatives of the City of Santa Clara police?

5       A.    Yes.

6       Q.    And other employees or officers of Silicon

7   Valley Animal Control Authority?

8       A.    Yes.

9       Q.    Any other organization that was there?

10      A.    Not to my knowledge.

11      Q.    Okay.  How long from the time that Officer

12  Morris made the call was it until these other officers

13  arrived?

14      A.    Within a few minutes; a few seconds, maybe.

15  They had to be there waiting.

16      Q.    Best estimate on the amount of time?

17      A.    Oh, maybe three minutes.

18      Q.    Can you recall who arrived first, the City of

19  Santa Clara or the Silicon Valley Animal Control

20  Authority?

21      A.    No; I couldn't tell you that.

22      Q.    Is it your recollection that they seemed to

23  arrive around the same time?

24      A.    The same time.

25      Q.    Okay.  All right.  And from the time that

1     A.    Yes.

2     Q.    Okay.  Do you know if there were any other

3 Silicon Valley Animal Control Authority employees or

4 officers there?

5     A.    To my knowledge those were the only three.

6     Q.    Okay.  All right.  So these officers from the

7 two organizations arrived, and then what happened?

8     A.    Well, then I felt that there was something

9 happening, and I ran to the door to grab my motorhome

10 door.  I was going to go in and lock the door so nobody

11 could come in.

12     Q.    Why did you do that?

13     A.    I didn't want anybody in.

14     Q.    Okay.  Then what happened?

15     A.    And Davis comes running across the parking

16 lot.  I have ahold of the door, and he comes running

17 across the parking lot and viciously grabs me by the arm

18 with his left hand and rolls his fist and slams the

19 door.  And I said you're hurting me.

20     Q.    And you said his left arm?

21     A.    He grabbed me with his left -- my right arm

22 with his left arm.  Very viciously.  He ran across the

23 parking lot, grabbed me, twisted, and swung my body out.

24     Q.    Okay.  Then what happened?

25     A.    And I said you're hurting me.  And he still

1    held onto me.  And he called Officer Soto to come and

2    get me.  I held onto the door and they pulled me away

3    from it.

4         Q.    And who pulled you away from it?

5         A.    Well, I guess he did and she did, both of

6    them.

7         Q.    That's Officer Soto and Officer Davis?

8         A.    Yes.  Well, he's not a policeman.  He's just

9    an animal control man.

10             MR. WILSON:  Do you mean Soto or Morris?  You

11    said Morris.

12         A.    Officer Soto.  Davis had ahold of me, and he

13    called Soto, Officer Soto, to come get me.  She is the

14    police lady.

15             MR. WILSON:  Okay.  I'm sorry.

16             MR. HAZELWOOD:   Q.  Okay.

17         A.    Morris never touched me.

18         Q.    Okay.  Then what happened?

19         A.    Well, Officer Soto took ahold of me and walked

20    me over to the patrol car.

21         Q.    And how did -- how was she -- was she holding

22    you during that time?

23         A.    Yes.

24         Q.    How was she holding you?

25         A.    I don't know.  She had ahold of my arm.

1     Q.    Okay.  Were you resisting at that point?

2     A.    Well --

3     Q.    Physically resisting?

4     A.    Well, I don't know if I was physically

5 resisting at that point, but later I did.

6     Q.    And when you say later, what do you mean

7 later?

8     A.    Well, she took me over to the car, and the

9 policeman standing there, he said open up the door and

10 let that lady sit down.  She wasn't even going to let me

11 sit down.  She was going to make me stand by the car.

12     So she opened up the door and I sat down.  The

13 police lady in front of me with a gun in her pocket.

14     Q.    Did she ever touch the gun or do anything with

15 the gun?

16     A.    No.  But when they started -- well, she held

17 her hand on the gun.  She kept her hand on the gun.

18     Q.    At what point?

19     A.    Well, through some of it.  But when --

20     Q.    I want to know specifically when.

21     A.    Well, she had her hand on the gun when I sat

22 down in the seat.

23     Q.    All right.  When you said she told the other

24 officer to open the door, she was talking to the Santa

25 Clara --

```
 1          R E P O R T E R ' S    C E R T I F I C A T E

 2

 3          I, MARSHA SIMPSON, a Certified Shorthand

 4   Reporter of the State of California, hereby certify that

 5   the witness in the foregoing deposition was by me duly

 6   sworn to tell the truth, the whole truth and nothing but

 7   the truth in the within-entitled cause; that said

 8   deposition was taken at the time and place therein

 9   stated; that the testimony of the said witness was

10   reported by me, a duly certified shorthand reporter, and

11   was thereafter transcribed by me or under my direction

12   into typewriting; and that the witness was given an

13   opportunity to read and, if necessary, correct said

14   deposition and to subscribe the same.

15          I FURTHER CERTIFY that I am not of counsel or

16   attorney for either or any of the parties in the

17   foregoing deposition and caption named, or in any way

18   interested in the outcome of the cause named in said

19   caption.

20          IN WITNESS WHEREOF, I have hereunto set my

21   hand this 13th day of June, 2008.

22
                    Marsha Simpson
23                  _____
                    MARSHA SIMPSON
                    Certified Shorthand Reporter
24                  Certificate No. 2771
                    State of California

25
```