1  MARK F. HAZELWOOD, # 136521
   DIRK D. LARSEN, # 246028
2  LOW, BALL & LYNCH
   505 Montgomery Street, 7th Floor
3  San Francisco, California 94111-2584
   Telephone: (415) 981-6630
4  Facsimile: (415) 982-1634
   Email: mhazelwood@lowball.com
5         dlarsen@lowball.com

6  Attorneys for Defendants
   SILICON VALLEY ANIMAL CONTROL
7  AUTHORITY, AL DAVIS, ANTJE MORRIS
   AND CITY OF CAMPBELL
8

9                  UNITED STATES DISTRICT COURT

10          NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE

11

12  LEE JACKSON and KENNETH JACKSON,     )   Case No. C07 05667 RS
                                         )
13                 Plaintiffs,           )   DECLARATION OF DANIEL
                                         )   SOSZYNSKI IN SUPPORT OF
14       v.                              )   DEFENDANTS SILICON
                                         )   VALLEY ANIMAL CONTROL
15  SILICON VALLEY ANIMAL CONTROL        )   AUTHORITY, AL DAVIS, ANTJE
    AUTHORITY, CITY OF SANTA CLARA, CITY )   MORRIS AND CITY OF
16  OF CAMPBELL, HUMANE SOCIETY SILICON  )   CAMPBELL'S MOTION FOR
    VALLEY DOES 1 TO 20,                 )   SUMMARY JUDGMENT, OR IN
17                                       )   THE ALTERNATIVE, PARTIAL
                   Defendants.           )   SUMMARY JUDGMENT
18  _____  )
                                             Date:        September 3, 2008
19                                           Time:        9:30 a.m.
                                             Courtroom:   4, 5th Floor
20                                           Judge:       Hon. Richard
                                                          Seeborg
21

22       I, DANIEL SOSZYNSKI, declare as follows:

23       1.    I have personal knowledge of the following facts, and could and would testify

24  competently thereto if called upon to do so.

25       2.    I am currently employed as Executive Director of the Silicon Valley Animal Control

26  Authority ("SVACA"). I have held this position since February 2004. Prior to that, I was employed as

27  follows: Operations Manager, SVACA (December 2001 to February 2004); Director of Animal Services,

28  Santa Cruz SPCA (March 1999 to December 2001); Humane Officer, Washington Humane Society

1  (March 1997 to March 1999); Animal Control Officer, Washington Humane Society (July 1995 to

2  March 1997); Office Manager, Takoma Park Animal Clinic (January 1995 to July 1995); Animal Care,

3  Bay Area Humane Society (1993 to 1994). My education and training in the field of animal safety, health

4  and protection consists of the following: California State Humane Academy Certificate (1999);

5  California State Euthanasia Certification (1999); California POST Penal Code § 832 and Firearms

6  Certification (1999); National Horse Abuse Investigator's School Certificate (American Humane

7  Association, 1999); Chemical Immobilization Certificate (Fairfax, Virginia, 1997); Maryland Animal

8  Control 101 Certificate (Howard County, Maryland, 1997); miscellaneous animal care/control and

9  management seminars (1997-present); Bachelor of Science Degree in Human Biology from the

10  University of Wisconsin-Green Bay (1992). I am familiar with SVACA's policies, procedures and

11  practices for creating and retaining reports and other records of its activities, including investigations and

12  seizures. I am also familiar with Penal Code § 597.1(f)'s requirements for the conduct of a hearing

13  following an immediate seizure of animal's made pursuant to Penal Code § 597.1(a).

14  　　　　3.　　　SVACA is a Joint Powers Authority created pursuant to Articles 1 through 4 of Chapter 4

15  of Division 7 of the Government Code (commencing with § 6500). A true and correct copy of the

16  currently operative Joint Exercise of Powers Agreement establishing SVACA is attached hereto as

17  Exhibit A and incorporated by this reference.

18  　　　　4.　　　On December 22, 2005, at 9:00 a.m., SVACA conducted a post-seizure hearing following

19  its December 19, 2005 seizure of 15 cats and 6 dogs from the motor home of plaintiffs Lee Jackson and

20  Kenneth Jackson ("Plaintiffs") in Santa Clara, California. Capt. Patterson of the Campbell Police

21  Department presided over the hearing in his capacity as a *pro tempore* SVACA officer pursuant to Penal

22  Code § 597.1(f)(2).

23  　　　　5.　　　On January 5, 2006, SVACA Field Services Manager Albert Davis, a representative of

24  the Santa Clara District Attorney's office and I met with Plaintiffs and inspected their motor home.

25  Officer Davis and I determined that Plaintiffs had not cleaned their motor home sufficiently and had not

26  demonstrated the ability to provide proper care for one dog, "Justice." In addition, SVACA never

27  received from Plaintiffs boarding, veterinary and impound fees for their animals pursuant to Penal Code

28  § 597.1(f)(4). Accordingly, Justice was not returned to Plaintiffs.

-2-

1    6.    On January 6, 2006, the animals seized on December 19, 2005, were formally turned over

2    to the Humane Society Silicon Valley.

3        I swear under penalty of perjury under the laws of the State of California that the foregoing is

4    true and correct to the best of my own personal knowledge.

5

6    Executed this _30_ day of July, 2008, in Santa Clara, California.

7

8

9                                        DANIEL SOSZYNSKI

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DANIEL SOSZYNSKI IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

J:\1042\sf0016\Pld\MSJ-Soszynski.Dec.wpd                                Case No. C07 05667 RS

# EXHIBIT A

# JOINT EXERCISE OF POWERS AGREEMENT FOR
# THE SILICON VALLEY ANIMAL CONTROL AUTHORITY

**THIS AGREEMENT** is made and entered into as of the Effective Date (set forth in Section 2.3) by and among the Member Agencies (defined in Section 1.12 below) signatory hereto, each of which is a public entity duly organized and existing under the Constitution and other laws of the State of California.

**WHEREAS**, Chapter 5 of Division 7 of Title 1 of the Government Code of the State of California (commencing at Section 6500) authorizes the Member Agencies to enter into an agreement for the joint exercise of any power common to them and, by that agreement, create an entity that is separate from each of the Member Agencies; and

**WHEREAS**, each of the Member Agencies possess the power to provide for the Animal Control Services (defined in Section 1.3), including animal field services, animal shelter services, and dead animal services within their respective Jurisdictional Area (defined in Section 1.4 herein below); and

**WHEREAS,** the Member Agencies possess the authority to issue bonds, expend bond proceeds, and borrow and loan money for certain public purposes pursuant to the Government Code of the State of California; and

**WHEREAS**, this Agreement is an appropriate means through which the Member Agencies may provide the Animal Control Services because the Jurisdictional Areas of the Member Agencies are in close proximity to one another and are susceptible of being served by the Animal Control Services and related Joint Facilities (defined in Section 1.10) under common administration and management and with the same equipment, resources and personnel; and

**WHEREAS**, the Member Agencies desire to share their animal control expertise and to optimize their expenditures in connection with the provision of the Animal Control Services and related Joint Facilities; and

**WHEREAS**, the separate provision, management and administration of the Animal Control Services and related Joint Facilities in each Jurisdictional Area by each of the respective Member Agencies and using separate facilities, resources and personnel may result in duplication of effort, inefficiencies in administration and excessive costs, all of which, in the judgment of the Member Agencies, can be eliminated or substantially reduced, all to the substantial advantage and benefit of the citizens and taxpayers of all of the Member Agencies, if the provision of the Animal Control Services and the administration and management of the related Joint Facilities employing common equipment, resources and personnel, were to be performed by and through a single public entity and the creation of such a single public entity is the purpose of this Agreement;

**NOW, THEREFORE**, for and in consideration of the facts stated above, the mutual advantages to be derived, and the mutual covenants contained herein, it is agreed by and among the Member Agencies hereto as follows:

**ARTICLE I**
**DEFINITIONS**

**Section 1.** Unless the context otherwise requires, the words and terms defined in this Article shall have the meanings specified.

**Section 1.1.** Act. "Act" means Article 1, Article 2, Article 3, and Article 4 (commencing with Section 6500) of Chapter 5 of Division 7 of Title 1 of the California Government Code, as it may be amended from time to time.

**Section 1.2.** Agreement. "Agreement" means this joint exercise of powers agreement as it now exists or as it may from time to time be amended, supplemented or as it may be modified by the addition of signatory parties or by any other supplemental agreement or amendment entered into pursuant to the provisions of this Agreement.

**Section 1.3.** Animal Control Services. "Animal Control Services" means those services enumerated on "Exhibit A," entitled "Animal Control Services," attached hereto and incorporated herein by this reference.

**Section 1.4.** Area. "Area" and "Jurisdictional Area" mean that area within the respective jurisdictions of the Member Agencies.

**Section 1.5.** Authority. "Authority" means the Silicon Valley Animal Control Authority created pursuant to this Agreement.

**Section 1.6.** Board of Directors. "Board of Directors" means the governing board of the Authority referred to in Section 1.5 and more particularly described in Section 2.5 herein below. "Director" means an individual member of the Board of Directors.

**Section 1.7.** Bond Law. "Bond Law" means Article 4 of Chapter 5 of Division 7 of Title 1 of the California Government Code, as the same may have been or may hereinafter be amended from time to time, or any other law hereafter legally available for use by the Authority in the authorization and issuance of bonds to finance needed public facilities. "Bonds" means any bonds issued pursuant to Bond Law.

**Section 1.8.** Executive Director. "Executive Director" means the employee of the Authority directly responsible to the Board of Directors and primarily responsible for the managerial oversight of the operations of the Authority as further described in Section 3.6.

**Section 1.9.** Fiscal Year. "Fiscal Year" means the period from July 1st to and including the following June 30th.

**Section 1.10.** Joint Facilities. "Joint Facilities" means the animal control facilities, equipment, resources, and property to be owned, leased, managed and operated by the Authority pursuant to

Article V and Section 7.1, and, if and when acquired or constructed, any improvements and additions thereto.

**Section 1.11.** Legislative Bodies. "Legislative Bodies" means the city or town councils of the Member Agencies of the Authority. "Legislative Body" means any such individual city or town council.

**Section 1.12.** Member Agencies or Member Agency. "Member Agencies" means all of the public agencies signatory to this Agreement, which, as of the initial Effective Date of this Agreement, are the City of Campbell, the City of Monte Sereno, and the City of Santa Clara. "Member Agency" means any such individual public entity.

**Section 1.13.** Quorum. Except as may otherwise be required hereunder or by law, "quorum" means the presence of the Santa Clara Director and either the Campbell or Monte Sereno Director.

**Section 1.14.** Rules of the Board. "Rules of the Board" means the bylaws, rules, regulations and other operational and organizational directives of the Board of Directors for the conduct of its meetings and other affairs as further described in Section 2.9.

**Section 1.15.** Secretary. "Secretary" means the Secretary of the Board of Directors as further described in Section 3.2.

**Section 1.16.** Treasurer. " Treasurer" means the financial director and finance manager of the Authority having the responsibility and accountability for the Authority's funds as further described in Section 3.3.

## ARTICLE II
## GENERAL PROVISIONS

**Section 2.1.** Purpose. The purpose of this Agreement is to create the Authority to provide for the joint exercise of powers by the Member Agencies to own, manage, operate and maintain the Joint Facilities and to implement the financing, acquisition and construction of additions and improvements thereto and any additional facilities and property later acquired, owned or managed by the Authority and included in the Joint Facilities and thereafter to manage, operate and maintain the Joint Facilities, as so added to and improved, all to the end that the residents of the Area are provided with a more efficient and economical provision of the Animal Control Services and related services consistent with the purposes of this Agreement, and, if necessary, to issue and repay revenue bonds of the Authority pursuant to the Bond Law. Each of the Member Agencies is authorized to exercise all powers (except the power to issue and repay revenue bonds of the Authority) pursuant to its organic law and the Authority is authorized to issue and provide for the repayment of revenue bonds pursuant to the provisions of the Bond Law.

**Section 2.2.** Creation of Authority. Pursuant to the Act, there is hereby created a public entity to be known as the "Silicon Valley Animal Control Authority," to be called the "Authority" pursuant to Section

1.5. The Authority, which shall administer this Agreement, is a public entity separate and apart from the Member Agencies and each of them.

**Section 2.3.**    Effective Date of Agreement.  This Agreement shall become effective when signed and executed by all Member Agencies listed in Section 1.12 (the "Effective Date") and shall supercede any prior agreements executed.

**Section 2.4.**    Term.  This Agreement shall become effective on the Effective Date set forth in Section 2.3 and shall continue in effect until such time as all Bonds (if any) and the interest thereon issued by the Authority under the Bond Law or the Act shall have been paid in full or provision for such full payment shall have been made, and thereafter until such time as the Authority and the Member Agencies shall have paid all sums due and owing pursuant to this Agreement or pursuant to any contract executed pursuant to this Agreement, and thereafter until terminated pursuant to Article IX.

**Section 2.5.**    Governing Board.  The Authority shall be administered by a Board of Directors consisting of three (3) Directors, as follows: one (1) Director appointed by each of the Legislative Bodies of the cities of Campbell, Monte Sereno and Santa Clara.

> **Section 2.5.1.**  All voting power of the Authority shall reside with the Board of Directors.

> **Section 2.5.2.**  The Board of Directors shall be called the "Board of Directors of the Silicon Valley Animal Control Authority."

> **Section 2.5.3.**  Each Director shall be a member of the Legislative Body of the Member Agency that appointed that Director.

> **Section 2.5.4.**  Each Legislative Body shall appoint an alternate Director for that Member Agency. The alternate Director may act as the Director in the absence of the Director appointed by that Legislative Body.  The alternate Director shall also be a member of the Legislative Body that appointed the alternate Director.

> **Section 2.5.5.**  All Directors and their alternates shall serve at the pleasure of the Member Agency that appointed them.

> **Section 2.5.6.**  All vacancies on the Board of Directors shall be filled by the respective Legislative Body within thirty (30) days of the effective date of the vacancy or as soon thereafter as the Legislative Body may legally act.  Any Director or alternate Director shall cease to be a Director when such person ceases to hold office as a council member of the respective appointing Legislative Body.

> **Section 2.5.7.**  Each Director may receive reimbursement for the reasonable and necessary expenses incurred in the performance of their duties, as provided in the Rules of the Board.

**Section 2.6.**    Meetings of the Board of Directors.  All meetings of the Board of Directors shall be public meetings unless a specified closed session is held in accordance with the California Government Code.

**Section 2.6.1.** Regular Meetings. The Board of Directors shall provide for regular meetings at a date, time, and place fixed by the Rules of the Board.

**Section 2.6.2.** Special Meetings. Special meetings and emergency meetings of the Board of Directors may be called in accordance with State law.

**Section 2.6.3.** Call, Notice, and Conduct of Meetings. All meetings of the Board of Directors, including without limitation, regular, adjourned regular, and special meetings, shall be called, noticed, held, and conducted in accordance with the provisions of Section 54950, et seq., of the California Government Code, as may be amended from time to time.

**Section 2.7.** Required Votes; Approvals. For all actions except those specified in Section 2.8, the Director from Santa Clara will have two votes at each meeting and the Directors from Campbell and Monte Sereno shall each have one vote. Three (3) affirmative votes of the Board of Directors shall be required for the Board of Directors to take any action other than those described in Section 2.8 provided a quorum is present as set forth in Section 1.13.

**Section 2.8.** Weighted Voting. In cases of (a) a tie vote or (b) actions described below requiring a four-fifths (4/5) vote, the Board of Directors will use a weighted voting procedure. Under weighted voting, the Director from the City of Santa Clara shall have three votes and the Directors from the other Member Agencies shall each have one vote. An affirmative four-fifths (4/5) weighted vote of the Board of Directors shall be required for the Board of Directors to propose an amendment to or termination of this Agreement; to approve the addition of new Member Agencies to this Agreement; to approve the issuance of any Bonds or the restructuring of any Bond financing; to approve any budget actions requiring increased amounts to be paid by a Member Agency over and above approved budget appropriations; and to modify the Member Agencies' contributions to Operating Costs pursuant to Section 6.3.2 below.

**Section 2.9.** Rules of the Board. The Board of Directors shall adopt and from time to time amend the Rules of the Board as are necessary or convenient in the determination of the Board of Directors to achieve or facilitate the purposes hereof.

**Section 2.10.** New Members. It is the intent of the member entities to provide, to the extent permitted by law, for the inclusion at a subsequent date of such additional public entities, organized and existing under the Constitution or laws of the State of California, as may desire to become parties to this Agreement and members of the Authority. The Board shall review all applications for participation in the Authority. Those entities seeking membership must be approved by the affirmative vote of a four-fifths majority of the entire Board of Directors. A new Member Agency shall be required to (a) make a "buy in" contribution in an amount to be determined by the Board, (b) pay their share of annual Operating Costs and other expenses pursuant to Section 6.3 and (c) contribute to the Capital Fund (see Section 5.4) as determined by the Board. For entities joining the Authority at other than the beginning of the Authority's fiscal year, cash contributions for Operating Costs and the Capital Fund shall be prorated for the remainder of the fiscal year.

# ARTICLE III
## ORGANIZATIONAL STRUCTURE
## OFFICERS AND EMPLOYEES

**Section 3.1.**   <u>Chairperson and Vice-Chairperson</u>. The Board of Directors shall elect a Chairperson and Vice-Chairperson from among its members. The Chairperson and Vice-Chairperson shall each serve a one year term. In the event of the disqualification or permanent inability of the Chairperson to serve as the Chairperson during their term, the Vice-Chairperson shall assume the duties of the Chairperson for the remainder of that term and the Board of Directors shall elect a new Vice-Chairperson for the remainder of that term.

> **Section 3.1.1.** The Chairperson shall be authorized to sign all resolutions of the Board of Directors and all contracts on behalf of the Authority and shall perform such other duties as may be imposed by the Board of Directors, consistent with the terms and provisions of this Agreement and the Rules of the Board.

> **Section 3.1.2.** The Vice-Chairperson shall be authorized to act as the Chairperson, exercise all of the powers of the Chairperson, and perform all of the duties of the Chairperson in the temporary absence of the Chairperson.

> **Section 3.1.3.** The Board of Directors, as a part of its approval of any contract, may authorize the Executive Director to execute the contract on behalf of the Authority.

**Section 3.2.**   <u>Secretary</u>. The Executive Director shall be the Secretary to the Board of Directors, perform such other duties as may be imposed upon the Secretary by the Board of Directors, and cause a copy of this Agreement to be filed with the California Secretary of State and the State of California pursuant to Section 6503.5 of the Act.

**Section 3.3.**   <u>Treasurer</u>. The Board shall designate the Treasurer. The Treasurer shall be the depository and shall have custody of all of the accounts, funds and money of the Authority from whatever source. The Treasurer shall have the duties and obligations set forth in Section 6505 and 6505.5 of the Act, and shall assure that there shall be strict accountability of all funds and reporting of all receipts and disbursements of the Authority.

**Section 3.4.**   <u>Officers in Charge of Property</u>. Pursuant to Section 6505 of the California Government Code, the Treasurer shall have charge of, handle, and have access to all accounts, funds, and money of the Authority and all records of the Authority relating to such accounts, funds and money; and the Secretary shall have charge of, handle, and have access to all other records of the Authority, and the Executive Director shall have charge of, handle, and have access to all physical properties of the Authority.

**Section 3.5.**   <u>Bonding Persons Having Access to Property</u>. From time to time, the Board of Directors may designate persons, such as the Treasurer or Executive Director, as the Authority officer(s) who shall have charge of, handle, or have access to any property of the Authority. The Board of Directors shall also fix the respective amounts of the official bonds of the Treasurer, Executive Director or such other designated persons pursuant to Section 6505.1 of the Act, which bonds shall be filed with the Secretary of the Authority. The actual cost of such bonds shall be a proper charge against the Authority.

**Section 3.6.** <u>Management</u>. The regular management of the operations and activities of the Authority shall be vested in the Executive Director. The Executive Director shall be appointed by the Board of Directors. Unless otherwise provided by the Rules of the Board or resolution of the Board of Directors, the Executive Director shall have the following powers:

**Section 3.6.1.** To provide for the planning, design, and construction of any additions or improvements to the Joint Facilities; leasing or remodeling of any existing facilities, or any new facilities to be operated by the Authority as authorized by the Board of Directors;

**Section 3.6.2.** Except as otherwise provided in Section 3.6.8, to execute any contracts for capital costs, costs of special services, equipment, materials, supplies, maintenance, or repair that involve an expenditure by the Authority within the limits and in accordance with procedures to be established by the Authority in the manner provided for local agencies pursuant to Article 7, commencing with Section 54201 of Chapter 5 of Part 1 of Division 2 of Title 5 of the California Government Code;

**Section 3.6.3.** To appoint and employ all personnel of the Authority required for maintenance and operation of the Joint Facilities, and all other employees authorized by the Authority's budget and by the Board of Directors;

**Section 3.6.4.** To retain any consultants, including labor relations consultants or certified public accountants, as authorized in the Authority's budget and by the Board of Directors;

**Section 3.6.5.** Subject to approval of the Board of Directors, to appoint and employ all personnel of the Authority or consultants required to be employed or retained in connection with the design of any additions or improvements of the Joint Facilities or construction of new facilities;

**Section 3.6.6.** To expend funds of the Authority and enter into contracts, whenever required, or for the immediate preservation of the public peace, health, or safety, subject to the subsequent ratification of the Board of Directors;

**Section 3.6.7.** To dispose of any personal property of the Authority as may be provided in the Rules of the Board or otherwise authorized by the Board of Directors;

**Section 3.6.8.** To approve and pay demands for payments by the Authority of Ten Thousand Dollars ($10,000.00), or less, which are authorized in the Authority's budget;

**Section 3.6.9.** To prepare and submit to the Board of Directors in time for revision and adoption by the Authority prior to March 1 of each year, the annual preliminary budget for the next succeeding Fiscal Year referred to in Section 6.1;

**Section 3.6.10.** Generally, to supervise the acquisition, construction, management, maintenance, and operation of the Joint Facilities and personnel of the Authority;

**Section 3.6.11.** To perform such other duties as directed by the Board of Directors and report to the Board of Directors at such times and on such matters as the Board of Directors may direct.

**Section 3.7.** <u>Legal Advisor</u>. The legal advisor of and provider of legal advice and services to the Authority shall be designated by the Board of Directors.

**Section 3.8.** <u>Other Services</u>. The Board of Directors shall have the power to appoint and employ such other consultants and independent contractors as may be necessary for the purposes of and pursuant to this Agreement.

**Section 3.9.** <u>Non-Liability of Agencies</u>. None of the officers, agents, or employees directly employed by the Authority shall be deemed, solely by reason of their employment by the Authority, to be employed by any Member Agency or, by reason of their employment by the Authority, to be subject to any of the requirements of any Member Agency. All of the privileges and immunities from liability, exemption from laws, ordinances and rules, all pension, relief, disability, workers' compensation, and other benefits which apply to the activities of the officers, agents, or employees of Member Agencies when performing their respective functions shall apply to them to the same degree and extent while engaged in the performance of any of the functions and other duties under this Agreement. Except as expressly provided for in this Agreement, nothing contained in this Article III is intended to nor shall it restrict or limit the rights or abilities otherwise available to the Authority to enter into agreements or other arrangements with any Member Agency in accordance with the terms and conditions of this Agreement and the Rules of the Board regarding the use of employees of the Member Agency in the operations and activities of the Authority.

**Section 3.10.** <u>Indemnity and Insurance</u>. The Authority shall defend, indemnify and save harmless each Member Agency to this Agreement and its respective councilmembers, officers and employees, from all claims, losses, damages, costs, injury and liability arising out of the Authority's performance of its powers, duties and responsibilities under this Agreement. The Authority shall obtain and keep in force policies of insurance with coverage and limits sufficient to protect the Authority and its Member Agencies from claims for damages arising from the activities of the Authority, its Board of Directors, officers and employees. It is the intent of this Section 3.10 that the policies of insurance described herein include coverage for automobile liability, comprehensive general liability, public officials errors and omissions, workers' compensation, and excess liability and other perils as the Board of Directors shall, from time to time, direct and that the coverage limits of these policies be maintained at levels as the Board of Directors shall direct. Each Member Agency shall be named an "additional insured" on the liability coverages or shall receive equivalent treatment or status under the Authority's insurance program.

**Section 3.11.** <u>Agreement Not for Benefit of Third Parties</u>. This Agreement shall not be construed as or deemed to be an agreement for the benefit of any third party or parties, and no third party or parties shall have any right of action hereunder for any cause whatsoever. Any services performed or expenditures made in connection with this Agreement by any Member Agency shall be deemed conclusively to be for the direct protection and benefit of the inhabitants and property in the respective Area of such Member Agency.

**ARTICLE IV**
**POWERS OF THE AUTHORITY**

**Section 4.1.**   General Powers.  The Authority shall exercise in the manner herein provided the powers common to each of the Member Agencies, as provided by the Constitution and laws of the State of California, and all incidental, implied, expressed, or necessary powers for the accomplishment of the purposes of this Agreement, subject to the restrictions set forth in Section 4.4.  As provided in the Act, the Authority shall be a public entity separate from the Member Agencies.  The Authority shall have the power to finance, acquire, construct, manage, maintain, and operate the Joint Facilities.  The Authority shall have all of the powers provided in Article 2 and Article 4 of the Act, unless specifically prohibited or restricted by this Agreement.

**Section 4.2.**   Specific Powers.  The Authority is hereby authorized, in its own name, to do all acts necessary for the exercise of the foregoing powers, including but not limited to, any of the following:

   **Section 4.2.1.** To make and enter into contracts;

   **Section 4.2.2.** To employ agents or employees;

   **Section 4.2.3.** To acquire, construct, manage, maintain, or operate any buildings, works or improvements;

   **Section 4.2.4.** To acquire, hold, or dispose of property;

   **Section 4.2.5.** To sue and be sued in its own name;

   **Section 4.2.6.** To incur debts, liabilities or obligations, subject to the provisions of this Agreement, provided that no debt, liability or obligation shall constitute a debt, liability or obligation upon any Member Agency;

   **Section 4.2.7.** To apply for, accept, receive, and disburse grants, loans, and other aids from any agency for the United States of America or of the State of California;

   **Section 4.2.8.** To invest any money in the treasury pursuant to Section 6505.5 of the Act that is not required for the immediate necessities of the Authority, as the Authority determines is advisable, in the same manner and upon the same conditions as local agencies, pursuant to Section 53601 of the California Government Code;

   **Section 4.2.9.** To carry out and enforce all the provisions of this Agreement.

**Section 4.3.**   Bonds.  The Authority shall have all of the powers provided in Article 4 of the Act, including the power to issue Bonds under the Bond Law.

**Section 4.4.**   Restrictions on Exercise of Powers.  The Authority shall exercise in the manner herein provided the powers common to all Member Agencies as appropriate to the accomplishment of the purposes of this Agreement.  For purposes of Govt. Code § 6509, the powers of the Authority shall be

exercised subject to the restrictions upon the manner of exercising such powers as are imposed upon the City of Campbell, a general law city.

**Section 4.5.**   Obligations of Authority.  The debts, liabilities, and obligations of the Authority shall not be the debts, liabilities, and obligations of any Member Agency.

## ARTICLE V
## METHODS OF PROCEDURE

**Section 5.1.**   Reserved.

**Section 5.2.**   Delegation of Powers.  Each Member Agency hereby delegates to the Authority the power to purchase and the power and duty to maintain, operate, and manage any animal control equipment, resources, and real property acquired and identified by the Member Agencies, including the future site of the Authority's animal control facility, and to employ the necessary personnel to do any and all other things necessary or desirable to provide efficient, economical and lawful Animal Control Services to the Member Agencies.

**Section 5.3.**   Joint Maintenance and Operation Fund.  The Board of Directors shall have a joint maintenance and operation fund (herein called the "Operating Fund").  The Authority shall assume responsibility for the maintenance and operation of the Operating Fund and shall pay the administrative and operational expenses of the Authority and all maintenance and operation costs of the Joint Facilities from said Operating Fund.  Each of the Member Agencies shall pay into said Operating Fund its proportionate share of the maintenance and operation costs of the Joint Facilities, computed on the basis set forth in Section 6.3 of this Agreement.

**Section 5.4.**   Capital Acquisition, Improvement and Replacement Fund.  The Board of Directors may create a capital acquisition and replacement fund ("Capital Fund") for the purpose of creating a fund for the acquisition and construction of the Joint Facilities and any other capital improvements owned or controlled by the Authority, and the replacement and acquisition of capital equipment and property of the Authority. Each Member Agency shall annually pay into said Capital Fund its proportionate share of capital costs, including principal and interest payments on outstanding Bonds, if any, as provided in Section 6.3.

## ARTICLE VI
## BUDGET/COSTS, MAINTENANCE AND
## OPERATION COSTS AND OTHER COSTS

**Section 6.1.**   Annual Budget.  The Board of Directors shall adopt a preliminary budget for maintenance and operation costs, capital costs, costs of special services, and debt service payments or redemption expenses on Bonds (if any), annually prior to March 1 of each year and shall adopt a final budget prior to June 30 of each year.

Each Member Agency shall approve the contribution of its allocated proportional share of the total estimated annual costs and expenses in the budget, as set forth in Section 6.3, prior to final adoption of the budget by the Board of Directors on or before June 30 of each year.

**Section 6.2.**    Records and Accounts.    The Authority shall cause to be kept accurate and correct books of account, showing in detail the capital costs, costs of special services and maintenance, operation costs of the Joint Facilities and the provision of the Animal Control Services, and all financial transactions of the Member Agencies relating to the Joint Facilities and the provision of the Animal Control Services, which books of account shall correctly show any receipts and also any costs, expenses, or charges paid or to be paid by each of the Member Agencies.    Said books and records shall be open to inspection at all times during normal business hours by any representative of a Member Agency, or by any accountant or other person authorized by a Member Agency to inspect said books or records.    The Controller/Treasurer shall, in accordance with Sections 6505 and 6505.6 of the Act, cause the books of account and other financial records of the Authority to be audited annually by an independent public accountant or certified public accountant.

**Section 6.3.**    Allocation of Costs and Expenses: Generally.

> **Section 6.3.1.**    Annual Estimate.    After adoption of the preliminary budget and prior to April 1 of each year, the Authority shall promptly furnish to each of the Member Agencies an estimate of the total annual maintenance and operation costs, capital costs, costs of special services, and debt service payments or redemption expenses on Bonds (if any).

> **Section 6.3.2.**    Operating Costs.    The proportion of Operating Costs to be borne by each Member Agency shall be determined by the Executive Director each year prior to March 1, and the Executive Director shall submit these percentages to the Board of Directors for review, modification and/or approval on or before April 1 of each year.    The Board of Directors may modify the manner in which each Member Agency's contribution to Operating Costs is determined or calculated by a four-fifths (4/5) vote of the Board of Directors.

> **Section 6.3.3.**    Capital Acquisition Costs, Costs of Special Services, Bond Expenses.    Costs of acquiring new equipment or constructing new facilities, costs of special services and Bonds interest and redemption expenses (if any) shall be borne by each Member Agency in the same proportion as Operating Costs determined, pursuant to Section 6.3.2, for the Fiscal Year in which the cost is incurred.

> **Section 6.3.4.**    Capital Costs.    The proportion of capital replacement costs to be borne by each Member Agency annually shall be the same proportion as Operating Costs borne by that Member Agency for that Fiscal Year as determined pursuant to Section 6.3.2.

> **Section 6.3.5.**    Insurance Costs.    The premiums for the insurance policies described in Section 3.10 shall be apportioned among the Member Agencies in the same manner as each Member Agency's yearly percentage of Operating Costs, as determined pursuant to Section 6.3.2 .    In the event of any claim for damages which is not covered by insurance, or which exceeds the limits of any applicable policy of insurance, the Member Agencies agree to allocate among themselves the uninsured costs of defending such claim, and the uncovered costs of settlement or judgment, if

any, in the same proportions as the percentage share of Operating Costs of each Member Agency as established pursuant to Section 6.3.2 at the time the claim is filed with the Authority.

**Section 6.4.**    Payment of Costs.  Beginning on the Effective Date of this Agreement, and quarterly in advance thereafter for each Fiscal Year, each Member Agency agrees to pay the Authority its allocated proportional share of the total estimated annual costs and expenses, as set forth in Section 6.3.

**Section 6.5.**    Sources of Funds.  Each Member Agency shall provide the funds required to be paid by it to the Authority under this Agreement from any source of funds legally available to such Member Agency for such purpose.

**Section 6.6.**    Level of Services and Charges to Member Agencies.  Each Member Agency may contract with the Authority for a greater or lesser level of service than the Animal Control Services set forth in this Agreement.  The Member Agencies acknowledge and agree that the contributions required pursuant to Section 6.3 of a Member Agency that enters into such a contract with the Authority may be modified accordingly, with the approval of the Board of Directors, to account for the greater or lesser level of service being provided to that Member Agency by the Authority.  Member Agencies requesting other animal related services from the Authority in addition to those Animal Control Services specified in Exhibit "A" of this Agreement shall be held financially responsible for direct additional costs incurred or encumbered by the Authority in the implementation of special programs, projects, and services.

## ARTICLE VII
## ENFORCEMENT

**Section 7.1.**    Reserved.

**Section 7.2.**    Enforcement by Authority.  The Authority is hereby authorized to take any or all legal or equitable actions, including but not limited to injunction and specific performance, necessary or permitted by law, to enforce this Agreement.

## ARTICLE VIII
## WITHDRAWAL OF A MEMBER AGENCY

**Section 8.1.**    Agreement Continues.  Notwithstanding the provisions of Section 9.1, each Member Agency agrees that the withdrawal of a Member Agency pursuant to this Article VIII is not intended to and will not terminate this Agreement or affect the ability of the Board of Directors or the remaining Member Agencies to carry out and fulfill the purposes of this Agreement.

**Section 8.2.**    Withdrawal.  A Member Agency may withdraw from the Authority and this Agreement by filing written notice thereof with the Authority.  Withdrawal will take effect on July 1 of any year provided there is a least six months advance notice.  The withdrawal of any Member Agency from the Authority shall in no way affect the rights and obligations of the remaining Member Agencies.  A withdrawing Member Agency is still obligated for all payments due from it for the fiscal year of the

withdrawal. Further, in the event of withdrawal of a Member Agency, the following terms and conditions will apply:

**Section 8.2.1.** Withdrawal shall not relieve the party of its proportionate share of any debts, liabilities or other contractual commitments incurred by the Authority prior to the effective date of the party's withdrawal; and

**Section 8.2.2.** If Bonds have been issued and the withdrawing Member Agency benefits directly or indirectly from the Bonds issued and outstanding, the Member Agency shall not withdraw from the Authority until such time as all of those Bonds and the interest thereon shall first have been paid in full or provision for such full payment shall first have been contractually made with the Authority and approved by the Board of Directors; and

**Section 8.2.3.** The obligations of the withdrawing Member Agency shall have been paid in full and provision for repayment of any other indebtedness which may exist shall be covered by an agreement made between the Authority and the Member Agency and approved by the Board of Directors.

**Section 8.3.**    Non-Distribution of Assets Upon Withdrawal or Subsequent Dissolution.  A withdrawing Member Agency will have no entitlement to any Assets or Cash Reserves (See Section 9.3 for definition of term) of the Authority nor any distribution or reimbursement of any kind from the Authority upon withdrawal or in the event of the Authority's subsequent dissolution.

**Section 8.4.**    Restrictions.   Any withdrawal from participation in this Agreement is subject to the restrictions on withdrawal contained in Sections 8.2 and 8.3, above.  In addition, each withdrawing Member Agency, upon its withdrawal, waives any right to seek a judicial apportionment of any interest it may have in the Authority, including any interest in any Assets or Cash Reserves of the Authority.


## ARTICLE IX
## TERMINATION OF THE AGREEMENT AND
## DISSOLUTION OF THE AUTHORITY

**Section 9.1.**    Termination.  This Agreement shall terminate and the Authority shall be dissolved upon an agreement of all Member Agencies.  Upon termination of this Agreement, any obligation of the Authority which continues following dissolution shall be borne by the Member Agencies based on the percentages determined pursuant to Section 9.3.

**Section 9.2.**    Effective Date of Termination.  Termination shall not under any circumstances become effective until June 30 next succeeding a minimum of twelve (12) months following the effective date of a written notice of termination to the Board of Directors approved by all Legislative Bodies of the current Member Agencies.

**Section 9.3.**    Disposition of Assets.  Upon dissolution of the Authority, each current Member Agency shall receive its proportionate share of the assets of the Authority as defined in this Section within a reasonable amount of time after dissolution, and each current Member Agency shall contribute its

proportionate or otherwise defined share toward the discharge of any enforceable liabilities incurred by the Authority as the same appear on the books of the Authority. Upon the termination of this Agreement, any assets acquired by the Authority during the period of its existence and still on hand and all unencumbered cash reserves (collectively, "Assets and Cash Reserves") shall be distributed to the current Member Agencies in the following manner: The total amount of maintenance and operating costs paid by each current Member Agency into the Operating Fund during the entire existence of the Authority shall be added together and the percentage which each Agency's total bears to the whole shall be determined. The Assets and Cash Reserves shall be divided among the current Member Agencies based on the above percentage, based on appraised value of the assets at the time of termination. In the event the current Member Agencies cannot agree on how the distribution of Assets and Cash Reserves pursuant to the distribution method set forth in this Section should be implemented, the City Managers of all of the current Member Agencies, or their respective designees, shall meet promptly to develop a method for distributing the Assets and Cash Reserves among the current Member Agencies.

**Section 9.4.**   The distribution of assets may be made in kind or assets may be sold and the proceeds thereof distributed to the Member Agencies at the time of dissolution after the discharge of all enforceable liabilities.

**Section 9.5.**   <u>Continued Existence of Authority</u>. Upon dissolution, this Agreement and the Authority shall continue to exist as required or necessary for the limited purpose of distributing the Assets and Cash Reserves and winding up and closing out the business, accounts and affairs of the Authority.

# ARTICLE X
# MISCELLANEOUS

**Section 10.1.** <u>Section Headings</u>. All section headings in this Agreement are for convenience of reference only and are not to be construed as modifying or governing language in the section referred to or to define or limit the scope of any provision of this Agreement.

**Section 10.2.** <u>Consent</u>. Whenever in this Agreement any consent or approval is required, the same shall not be unreasonably withheld.

**Section 10.3.** <u>Law Governing</u>. This Agreement is made under the Constitution and laws of the State of California and is to be so construed.

**Section 10.4.** <u>Amendments</u>. This Agreement may be amended at any time, except as limited by Bond covenants, if any. All amendments to the Agreement must be in writing, and must be approved by the Legislative Bodies of the Member Agencies prior to becoming effective.

**Section 10.5.** <u>Severability</u>. In the event any provision of this Agreement is determined to be illegal or invalid for any reason, all other provisions and articles of this Agreement shall remain in full force and effect unless and until otherwise determined. The illegality of any provision of this Agreement shall in no way affect the legality and enforceability of any other provisions of this Agreement.

**Section 10.6.**  <u>Successors</u>.  This Agreement shall be binding upon and shall inure to the benefit of the successors of the respective Member Agencies.  No Member Agency may assign any right or obligation hereunder without written consent of the other Member Agencies.

**Section 10.7.**  <u>Notice</u>.  Any notice required to be given or delivered by any provision of this Agreement shall be personally delivered or deposited in the U.S. mail, postage prepaid, addressed to the Authority and to the Member Agencies at their addresses as reflected in the records of the Authority, and shall be deemed to have been received by the party to which the notice is addressed upon the earlier of receipt or 72 hours after mailing.

1144103.1

## EXECUTION OF AGREEMENT

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed and attested by their proper officers thereupon duly authorized and their official seals to be hereto affixed on the dates as shown herein.

## MEMBER AGENCIES

APPROVED AS TO FORM:                    **CITY OF CAMPBELL,** a municipal corporation

By: _____          By: _____
Its: _____         Its: _____
Date: _____          Date: _____

ATTEST:

By: _____
Its: _____
Date: _____

APPROVED AS TO FORM:                    **CITY OF MONTE SERENO,** a municipal corporation

By: _____          By: _____
Its: _____         Its: _____
Date: _____          Date: _____

ATTEST:

By: _____
Its: _____
Date: _____

APPROVED AS TO FORM:                    **CITY OF SANTA CLARA,** a municipal corporation

By: _____          By: _____
Its: _____         Its: _____
Date: _____          Date: _____

ATTEST:

By: _____
Its: _____
Date: _____

**EXHIBIT "A"**
**ANIMAL CONTROL SERVICES**

The term "Animal Control Services" in the Agreement to which this Exhibit "A" is attached means all of the following services:

A.     <u>Field Services</u>

Field services means all of the following services, including any vehicles, communications equipment, office supplies, field and administrative personnel, and any other personnel, supplies and equipment, reasonably required to perform the following services (the "Field Services"):

- Pick up of confined stray dogs, cats, and other small animals, including, rabbits, chickens, turkey, geese, and ducks, and excluding confined wildlife as defined in Section 711.2 of the California Fish and Game Code, such as opossums, raccoons, skunks, or squirrels

- Pick up confined stray livestock, including horses, pigs, goats, sheep, and donkeys

- Pick up of dead animals, including wildlife, as described in more detail below under the description of Dead Animal Services

- Pick up of injured stray dogs or cats and other small animals, without regard to weight, and injured wildlife weighing fifty pounds (50 lbs.) or less, that are located on public property or readily accessible on private property with the permission of the property owner or occupant or the property owner's or occupant's authorized agent

- Response to emergency calls

- Investigating complaints of animal bites or attacks on humans, including the completion of a report interviewing the parties involved, quarantining animals which have bitten humans, preparing and transporting biting animals for rabies testing, and investigating alleged violations of a quarantine

- Response to calls for removal of venomous snakes in a private residence and on private property

- Investigating complaints of vicious dogs

- Investigating complaints of dangerous animals

- Responding to complaints of animals running at large

- Responding to complaints of domestic animals causing a nuisance, except domestic animals making noise, and provide follow-up patrol

1144103.1

- Responding to police assist calls on animal-related issues, which service may include taking control of an animal on the scene

- Investigating complaints regarding the lack of proper care, condition, or attention of domestic animals by their owners

- Investigating complaints regarding cruelty to animals

- Investigate complaints regarding exceeding the limit of the maximum number of animals

- Investigate complaints regarding unsanitary conditions

- Provide Community Outreach Humane Education programs to local schools as well as presenting programs to civic groups and organizations, Neighborhood Watch, homeowners groups and more

- Provide animal safety training for service workers (i.e. postal employees, meter readers)

B.    Shelter Services

Shelter Services means all of the following services, including shelter facilities, supplies, animal attendants, supervisors and administrative personnel, and any other personnel, supplies and equipment reasonably required to perform the following services (the "Shelter Services"):

- Shelter of abandoned, impounded, lost or stray domestic animals brought to the shelter by a Member Agency, a resident residing in a Jurisdictional Area, or shelter personnel

- Quarantine of biting animals

- Rabies testing of suspect animals

- Provision for surrender and reclaim of abandoned, lost or stray domestic animals during established business hours

- Euthanasia and disposal of abandoned, lost, impounded, or stray domestic animals that are unclaimed by their owners and fail to meet the written health and temperament standards of the shelter

C.    Medical Services

Medical Services means all of the following services, including office facilities, supplies, and professional and trained personnel necessary to perform the following services (the "Medical Services") by staff or through contracts:

- Provision of veterinarian services by staff or through contracts twenty-four (24) hours per day to treat and provide veterinarian care to stray dogs, cats, and other impounded animals that may be sick or injured

- Monitor quarantined biter animals

- Conduct vaccination clinics and have available, free of charge to the public, rabies control information.

D.    Dead Animal Services

Dead Animal Services means all of the following services, including any vehicles, storage facilities, disposal mechanisms, field and administrative personnel, and any other personnel, supplies, contracts and equipment required to perform the following services (the "Dead Animal Services"):

- Pick up of dead animals, including wildlife and except livestock, from streets and public property within Jurisdictional Areas, or from private property within Jurisdictional Areas with the permission of the property owner, occupant or a representative of the property owner or occupant

- Identification of and notification to the owner of the dead animal, whenever possible

- Disposal of the body of the dead animal

E.    Animal Licensing Services

Animal Licensing Services means all of the following services, including any vehicles, office facilities, supplies, equipment and personnel necessary to perform the following services (the "Animal Licensing Services"):

- Computerized Animal Licensing including up to two delinquent notices on license renewals

- Comprehensive community outreach program, to include issuing licenses at the "actual cost" rabies vaccination clinics

- Distribute Licensing information through the local veterinarians and on the web site

- Issue Assistance Animal identification tags to qualified residents as required by state law

F.    Other Services For Which a Fee May Be Charged

- Pick up owned animals

- Provide humane traps to the public to capture sick, injured, or nuisance domestic animals