Harry C. Gilbert, Esq. (SBN 129944)
Steven R. Myers, Esq. (SBN 203694)
JOSEPH COSTELLA & ASSOCIATES
215 Lennon Lane, Suite 200,
Walnut Creek, Ca 94598
Telephone  (925) 945-4491
Facsimile:  (925) 746-3916

Attorneys for Defendant,
HUMANE SOCIETY SILICON VALLEY

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| LEE JACKSON and KENNETH JACKSON, | Case No: C07 05667 RS |
| Plaintiffs, | DECLARATION OF KARREN L. FREEDMAN IN SUPPORT OF DEFENDANT HUMANE SOCIETY SILICON VALLEY'S MOTION FOR SUMMARY JUDGMENT, OR, ALTERNATIVELY, FOR PARTIAL SUMMARY JUDGMENT |
| v. | |
| SILICON VALLEY ANIMAL CONTROL AUTHORITY; CITY OF SANTA CLARA; CITY OF CAMPBELL; HUMANE SOCIETY SILICON VALLEY and DOES 1 TO 20, | Date:  September 3, 2008 Time:  9:30 a.m. Courtroom:  4 Judge:  Richard Seeborg |
| Defendants. | |

I, Karren L. Freedman, declare:

1.  I am an attorney licensed in California and I am also admitted to practice in the United States District Court for the Northern District of California.  I am an attorney with Joseph Costella & Associates, counsel of record for the Humane Society Silicon Valley, a defendant herein.

2.  On June 11, 2008, I attended the depositions of plaintiffs Kenneth Jackson and Leola (Lee) Jackson.  The deposition testimony was transcribed by a court reporter.

---

3. Attached hereto as **Exhibit A** are true and correct excerpts from the deposition transcript of Kenneth Jackson. Deposition exhibits are attached hereto immediately following the excerpts and are part of Exhibit A.

4. Attached hereto as **Exhibit B** are true and correct excerpts from the deposition transcript of Leola (Lee) Jackson.

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States (Walnut Creek, California) on July 28, 2008.

Karren L. Freedman

DECLARATION OF KARREN L. FREEDMAN - C07 05667 RS

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---


LEE JACKSON and KENNETH JACKSON,

       Plaintiffs,

    vs.                     No. C08-05667RS

SILICON VALLEY ANIMAL CONTROL
AUTHORITY; CITY OF SANTA CLARA;
CITY OF CAMPBELL; HUMANE SOCIETY
SILICON VALLEY and DOES 1 to 20,

      Defendants.

_____/



DEPOSITION OF KENNETH JACKSON

Wednesday, June 11, 2008








ROOMIAN & ASSOCIATES
Certified Shorthand Reporters
Reported by:        225 Bush Street, Suite 348
MARSHA SIMPSON     San Francisco, CA 94104
CSR No. 2771        (415) 362-5920

1      Q.    Okay.  And in reviewing the transcript you are

2  going to be given the opportunity to make any

3  corrections or changes to your testimony that you feel

4  are necessary.  Do you understand that?

5      A.    I do understand that.

6      Q.    Okay.  I do want to caution you if this case

7  were to go to a trial and you make substantive changes

8  to your testimony, I or one of the other attorneys in

9  the case could comment on those changes because that

10  could affect your credibility.  Do you understand that?

11      A.    I understand that.

12      Q.    Okay.  So it's important that you give us your

13  very best responses, your very best recollection today;

14  okay?

15      A.    I will do that.

16      Q.    Good man.  All right.  Let's get started,

17  then.  Can you give us your date of birth, please?

18      A.    2 February '25.

19      Q.    And where were you born?

20      A.    Morgan Hill, California.

21      Q.    And where do you currently reside?

22      A.    Where do I live?

23      Q.    Yes.

24      A.    We live in our own motorhome.

25      Q.    All right.  Do you have any plans in moving

1    out of the motorhome at this time?

2        A.    Immediately, no, but we hope to in the

3    comparatively near future.

4        Q.    How long have you lived in the motorhome as

5    your primary residence?

6        A.    I am thinking for just a moment.

7        Q.    That's fine.  Take your time.

8        A.    I am going to preface this with I think.  I'm

9    quite sure it is 15 years, approximately.

10       Q.    All right.  And you consider that your home,

11   the motorhome?

12       A.    Yes.

13       Q.    My understanding is you're married; is that

14   correct?

15       A.    Yes.

16       Q.    What is your wife's name?

17       A.    Leola.  L-e-o-l-a.

18       Q.    Does she also go by Lee?

19       A.    Yes, she does.

20       Q.    How long have you been married?

21       A.    Forty-three years in September.

22       Q.    Okay.  Do you have any children?

23       A.    No children.

24       Q.    Do you remember the date of the incident that

25   we're here about?

1    out of the motorhome at this time?

2        A.    Immediately, no, but we hope to in the

3    comparatively near future.

4        Q.    How long have you lived in the motorhome as

5    your primary residence?

6        A.    I am thinking for just a moment.

7        Q.    That's fine.  Take your time.

8        A.    I am going to preface this with I think.  I'm

9    quite sure it is 15 years, approximately.

10       Q.    All right.  And you consider that your home,

11   the motorhome?

12       A.    Yes.

13       Q.    My understanding is you're married; is that

14   correct?

15       A.    Yes.

16       Q.    What is your wife's name?

17       A.    Leola.  L-e-o-l-a.

18       Q.    Does she also go by Lee?

19       A.    Yes, she does.

20       Q.    How long have you been married?

21       A.    Forty-three years in September.

22       Q.    Okay.  Do you have any children?

23       A.    No children.

24       Q.    Do you remember the date of the incident that

25   we're here about?

1  years in the —

2      Q.    Do you remember what decade?

3      A.    In the seventies, primarily.

4      Q.    Okay.  When did your wife stop working outside

5  of the home?

6      A.    She stopped working before we were married.

7  Approximately, that would be about, what, 44 years.

8      Q.    Okay.  Since 2000, since the year 2000, has

9  anybody, any person resided with you and your wife?

10     A.    No.

11     Q.    All right.  We talked about the incident date

12 being December 19, 2005.  Do you remember what day of

13 the week that was?

14     A.    I think it was Monday.

15     Q.    Do you remember approximately what time the

16 events took place?

17     A.    Yes.  About one o'clock in the afternoon.

18     Q.    Okay.  And where did these events take place?

19     A.    They took place in the parking lot at Boston

20 Market in Mervyn's Plaza in Santa Clara.

21     Q.    All right.  Now did you have your motorhome

22 there at that time?

23     A.    It arrived at that place from where I was

24 working.  I got off work at 12:00 noon, and we drove

25 over to Mervyn's Plaza.

1    A.    Yeah.  We didn't really stay there as a matter

2    of habit.

3    Q.    Okay.

4    A.    I should say we did have the permission of the

5    shopping mall there to stay there.  Because, one -- we

6    were told once that we couldn't stay there, and my wife

7    called Mr. Lodge, the Chief of Police, and he said get

8    permission from them.  And they did give us permission,

9    but we never did stay there after that.

10    Q.    Then at some point during that afternoon at

11    around one o'clock were you contacted by an officer from

12    the Silicon Valley Animal Control Authority?

13    A.    Yes.

14    Q.    And was that, was the initial person that you

15    were contacted by, was that a man or a woman?

16    A.    A woman.

17    Q.    Okay.  Do you know her name?

18    A.    Antje Morris.  I don't know whether the Antje

19    is an abbreviation of a regular name or that is her

20    name.  I'm not sure.

21    Q.    It's actually spelled A-n-t-j-e.  And had you

22    ever met or seen her before?

23    A.    No, I haven't.

24    Q.    And where were you -- did she appear there at

25    the Mervyn's parking lot?

1    A.    Yes, she did.

2    Q.    Okay.  And where were you when you first were

3  contacted by her?

4    A.    I was inside the motorhome.

5    Q.    All right.  And was your wife also inside the

6  motorhome?

7    A.    Yes.

8    Q.    And did Ms. Morris, Officer Morris, knock on

9  the door?

10    A.    Yes, she did.

11    Q.    And then who responded to the knock?

12    A.    I did.  Well, my wife and I both did,

13  actually.  We both came to the door.

14    Q.    Okay.  All right.  And was there some

15  conversation at that point?

16    A.    Antje Morris said I'm here to check your dogs.

17  Something to that effect.

18    Q.    Okay.  Did she identify herself as an officer

19  with the Silicon Valley Animal Control Authority?

20    A.    I'm sure she did.  I don't really recall that.

21    Q.    Okay.  All right.  And once she had identified

22  herself and asked, told you that she had, was there to

23  check dogs, what was the response?

24    A.    My wife brought two of our dogs to her to look

25  at.

1     Q.    All right.  And was that outside of the

2  motorhome?

3     A.    She took the two dogs outside the motorhome

4  and had her look at them.

5     Q.    And do you remember the names of those dogs?

6     A.    Calae was one of them.  I think it's

7  C-a-l-a-e.

8     Q.    I think it might be K-a-l-a-e.

9     A.    I don't know my wife's spellings for some of

10  these dogs.  Calae.  And Minnilinn I believe was the

11  other.

12     Q.    I think that's right.  M-i-n-n-i dash L-i-n-n.

13     A.    Probably.

14     Q.    Okay.  Before Ms. Jackson brought the dogs

15  outside to look at them, was there any discussion about

16  Officer Morris coming inside?

17     A.    Not at that time.

18     Q.    Okay.  And were you present while this

19  conversation was going on before the dogs were brought

20  outside?

21     A.    Yes.

22     Q.    So Officer Morris said I'm here to take a look

23  at the dogs.  Did she say she had had a report of any

24  problems with dogs or cats?

25     A.    No, she did not.

1    recollection on the number.

2        A.    That's probably correct.  So I'm right on the

3    dogs.  Okay.  This is correct.

4        Q.    Okay.  All right.

5        A.    I was mistaken.

6        Q.    That's okay.  That's why I wanted to show it

7    to you, so we're right on the number.

8        A.    Other than some misspellings.  But otherwise

9    it's correct.

10       Q.    Okay.  Why don't -- we are going to mark this

11   document, this Inventory List, as Exhibit B.

12            (Exhibit B was marked for identification.)

13            MR. HAZELWOOD:  Q.  All right.  Did you and

14   your wife consider yourself the owners of all 21 of

15   these pets, of these animals?

16       A.    Yes.  Correction.  Other than those two feral

17   cats; yes.

18       Q.    All right.  And with regard to the two feral

19   cats, what was the -- were you just holding them, or

20   what was your thinking on those?

21       A.    My wife had a friend who was very interested

22   in adopting them.

23       Q.    Where had you gotten the two feral cats?

24       A.    They were in the parking lot at the Bridge

25   Bank, which is in the plaza there at Mervyn's.

1    Q.    How long had you had them?

2    A.    Perhaps six months.  I'm not sure.

3    Q.    And so you considered that you were not owning

4  those; you were just holding them until someone would

5  take them?

6    A.    Correct.

7    Q.    Okay.  And if I'm looking at the list here, is

8  that the first two cats listed there?  Is that Kat—Chee

9  and Kat—Chaa?

10    A.    Yes.

11    Q.    Two Siamese?

12    A.    Correct.

13    Q.    Okay.  Okay.  Who was the friend that was

14  going to adopt them?

15    A.    I don't remember.

16    Q.    Do you recall a person by the name of Judy?

17  Could it have been Judy?

18    A.    Yes.

19    Q.    Who is Judy?

20    A.    Judy Kucera.

21    Q.    K—u —

22    A.    She was a friend of my wife's.  An

23  acquaintance, really.  Not a friend primarily, but an

24  acquaintance.

25    Q.    Okay.  And how long have you known Judy?

1  Morris had the tooth been extracted?

2      A.    I don't know.

3      Q.    Was it more than a year before?

4      A.    Yes.

5      Q.    Had you had Calae's jaw examined by a

6  veterinarian?

7      A.    I don't, I don't know.  I really don't.

8      Q.    All right.  Are you aware of Calae having any

9  problems with -- I'm sorry, is Calae a female?  Do you

10  know if it's --

11      A.    Female; yes.

12      Q.    Of course.  I'm sorry.  Whether Calae had any

13  problems with her eyesight?

14      A.    No.

15      Q.    Are you aware as to whether she had any dental

16  problems?

17      A.    No.

18      Q.    Did you feel that she was underweight at all

19  at the time of the visit from Officer Morris?

20      A.    No.

21      Q.    Okay.  So Officer Morris looks at the dogs

22  outside the motorhome?

23      A.    Those two dogs; yes.

24      Q.    How long did that take?

25      A.    A few minutes.

1      Q.    Okay.  Then what happened?

2      A.    She came -- she said I'm coming in.  I'm going

3   to look at your dogs.  You're homeless.  And she pushed

4   herself right on in.

5      Q.    Okay.  Was that the extent of the discussion?

6      A.    Yes.

7      Q.    Was there -- so is it your testimony that she

8   did not ask to come in; she just said she was?

9      A.    She did not ask.  She said I'm coming in.

10      Q.    Okay.  And did you or your wife say anything

11   in response to that?

12      A.    I didn't say anything.  I was outside.  I

13   guess my wife was outside also.

14      Q.    Right.

15      A.    My wife may have said something.  But I don't

16   recall what it was, if anything.

17      Q.    Okay.  And then what took place?

18      A.    She came out.

19      Q.    Okay.

20      A.    She came out right away.  She was only there a

21   few moments and came right on out.

22      Q.    So she went into the door of your motorhome?

23      A.    She went right on in there.

24      Q.    Did you follow her?

25      A.    No; I stayed outside.

1  even write down the correct names or the coloring of

2  many of them.

3      Q.    Was she taking notes while you were doing

4  this?

5      A.    She was writing it all down, Mr. Hazelwood.

6      Q.    Okay.  How do you know she didn't take it down

7  correctly?

8      A.    Because when I got the things just recently

9  from the, through my attorney, they weren't correct.

10      Q.    Okay.  All right.  At any point in time while

11  Officer Morris was in your motorhome before you gave her

12  the names did you object to her being in the motorhome?

13      A.    I didn't take any time to talk to her.  I was

14  more interested in just letting her see them.

15      Q.    All right.  Did your husband have any

16  conversation with Officer Morris while Officer Morris

17  was in the motorhome before you gave her the names?

18      A.    To my knowledge, no, I don't remember him -- I

19  don't know.  I don't remember him saying anything.  I

20  was very upset about Minni-Linn's health.  That was more

21  important to me at the time.  I was worried about her.

22  I wanted to get going.

23      Q.    Okay.  So you were outside and you were giving

24  the names to Officer Morris.  Then what happened?

25      A.    Then she got on the telephone, and all of a

1   sudden everything came.  Trucks, animal control, police

2   department, everybody, all at once.

3       Q.   All right.  So that would have been

4   representatives of the City of Santa Clara police?

5       A.   Yes.

6       Q.   And other employees or officers of Silicon

7   Valley Animal Control Authority?

8       A.   Yes.

9       Q.   Any other organization that was there?

10      A.   Not to my knowledge.

11      Q.   Okay.  How long from the time that Officer

12   Morris made the call was it until these other officers

13   arrived?

14      A.   Within a few minutes; a few seconds, maybe.

15   They had to be there waiting.

16      Q.   Best estimate on the amount of time?

17      A.   Oh, maybe three minutes.

18      Q.   Can you recall who arrived first, the City of

19   Santa Clara or the Silicon Valley Animal Control

20   Authority?

21      A.   No; I couldn't tell you that.

22      Q.   Is it your recollection that they seemed to

23   arrive around the same time?

24      A.   The same time.

25      Q.   Okay.  All right.  And from the time that

1    an additional 19 photographs that I understand were

2    taken by the Silicon Valley Animal Control Authority,

3    and I want you to go through them.

4            My first question after you get done is -- my

5    first question will be do these photographs depict the

6    interior of your motorhome?  Just go ahead and go

7    through those.

8        A.    Yes.

9        Q.    Okay.  All right.  Why don't we mark these

10   collectively as Defendant's next in order.  H.

11           (Exhibit H was marked for identification.)

12           MR. HAZELWOOD:  Q.  All right.  I'm going to

13   number these.  All right.  I've numbered these pages of

14   Exhibit H 1 through 19.  I just want to ask you some

15   questions about what we're looking at.

16           With regard to page 1, does this show up the

17   front area of the motorhome?

18       A.    Yes, it does.

19       Q.    Were any of the animals kept up in that area?

20       A.    No.

21       Q.    Okay.  Where did you and your wife sleep?

22       A.    My wife slept on the couch.

23       Q.    In which room?

24       A.    In the front room.

25       Q.    Okay.  Is this the area where the driver's

1    seat is?  Is that considered the front room?

2        A.    Yes.

3        Q.    Okay.

4        A.    Probably, this was probably taken from the

5    couch, or the area of the couch.  There's the driver's

6    seat, and the couch is right here (indicating).  You

7    can't see it there in the picture.

8        Q.    You can't see it in the first photograph of

9    Exhibit H?

10       A.    No, you can't see the couch there.

11       Q.    All right.  You said your wife would sleep on

12   the couch in the front room.  Where would you sleep?

13       A.    On the floor in the kitchen.

14       Q.    You slept on the floor in the kitchen?  Okay.

15   Does photograph number 2 show again the front room?

16       A.    Correct.

17       Q.    Okay.  And the same with regard to photograph

18   number 3?  A slightly different angle?

19       A.    This is the center and right-hand side of the

20   motorhome and front.

21       Q.    Okay.

22       A.    That's the right-hand window there.  Here

23   (indicating).

24       Q.    In the upper right-hand corner?

25       A.    Yeah, that is the right-hand window of the

1    Q.    Okay.  So the small dogs would collectively

2  use this area?

3    A.    Yes, one at a time.  They are trained to go to

4  the bathroom.  And it's covered with plastic.  And then

5  the individual papers are put down over each dog, or the

6  papers are exchanged each time the dog goes to the

7  bathroom, and put into large bags.

8    Q.    How about photograph 14, what are we looking

9  at there?

10    A.    That's the shower.

11    Q.    All right.  And there's a garbage bag in there

12  and some empty water bottles?

13    A.    Yeah, a garbage bag full of aluminum cans.

14    Q.    Okay.  How about in photograph 15, what are we

15  looking at?

16    A.    Refrigerator.

17    Q.    Okay.  And what was kept in the refrigerator?

18    A.    Usually we would have food in there, but the

19  refrigerator is being -- was going to be repaired.

20    Q.    So you didn't have any food in there at the

21  time of the inspection by Officer Morris?

22    A.    There's no food in there at all.

23    Q.    How long had you not had food in there?

24    A.    I can't say precisely, but two or three

25  months, I think.

1    Q.    Okay.  What had you been using in lieu of

2    having a refrigerator?

3    A.    We eat food at takeout.

4    Q.    Okay.  Photograph 16, I think, is another

5    photograph of the shower?

6    A.    Yes.

7    Q.    All right.  Now was the shower working at this

8    time?

9    A.    Yes.

10    Q.    Did you use the shower?

11    A.    No.

12    Q.    Why not?

13    A.    We just do not use it.

14    Q.    All right.  I know it's difficult because

15    these are blurry.  Can you tell what area of the house

16    these last three photographs, 17, 18 and 19 are?

17    A.    I can't.  I think this is a part of the couch.

18    I really cannot.

19    Q.    And I certainly understand, because they are

20    very blurry.

21    A.    I think that's the area of the couch there.

22    Q.    Okay.  That's fine.  Before Mrs. Jackson

23    blocked the door to the motorhome, I think you mentioned

24    that Officer Davis said that he was going to come in?

25    Let me ask it another way.  What prompted your wife to

1    stop blocking the door that they would have to put her

2    in the patrol car?

3         A.    Possibly.  Possibly.  I don't -- I can't

4    remember specifically, but I think so.

5         Q.    Okay.  And did she refuse to stop blocking the

6    door?

7         A.    No.  She came.

8         Q.    She came voluntarily?

9         A.    (Witness nods head.)

10        Q.    Is that right?

11        A.    Semi-voluntarily, I guess you might say.

12        Q.    What do you mean by that?

13        A.    Because she didn't like going.  She was

14   fighting the hold on her.  It was hurting her the way

15   her neck was being held.

16        Q.    By Officer Soto?

17        A.    She was crying.  Yes.  She was sobbing.

18        Q.    Did she tell Officer Soto that the way she was

19   being held was hurting her?

20        A.    Yes.

21        Q.    Do you know if she had any bruises or cuts of

22   any kind in the shoulder area or the neck from where she

23   was being held?

24        A.    No.

25        Q.    All right.  So you have told us that the three

1    Silicon Valley Animal Control Authority officers then

2    went into the motorhome.  You remember one coming out

3    with a camera at some point; correct?

4        A.    Yes.

5        Q.    And then at some point then, then the officers

6    began to take the animals out?

7        A.    Yes.

8        Q.    All right.  How long did that process take?

9        A.    Oh, half an hour.  Minimum half an hour, maybe

10   an hour.  Maximum.  I was distraught, too.

11       Q.    Okay.  Did you have any discussion with the

12   officers while this was going on?

13       A.    Not the Silicon Valley officers, no, but the

14   police officer.  There was a male police officer with

15   Ms. Soto.  And he had a couple of comments to make.

16       Q.    What were those?

17       A.    I don't want any part of this is what he said.

18   I don't like being here.

19       Q.    Do you know that officer's name?

20       A.    No, I don't.

21       Q.    Can you describe him for me?

22       A.    Probably Latin.  Tall, a little heavy, 27.

23       Q.    That's an approximate age?

24       A.    Approximate age.

25       Q.    Okay.  Did you have any further conversation

1   or discussion with or hear comments from the City of

2   Santa Clara officers that you haven't told me about?

3      A.    No, no.

4      Q.    All right.  Did your wife remain in the patrol

5   car while this process was taking place?

6      A.    Yes.  Ms. Soto continually kept her hands on

7   her shoulders and neck the whole time.

8      Q.    Okay.  All right.  After the —— and again you

9   remained outside the motorhome during this process?

10     A.    Yeah.  I stayed with my wife.

11     Q.    Okay.  And after the animals had been taken

12   from the motorhome and put into the Silicon Valley

13   vehicles, what happened at that point?

14     A.    They left.

15     Q.    Okay.  Did the City of Santa Clara officers

16   then leave also?

17     A.    Yes.

18     Q.    Did they take your wife with them, or was she

19   allowed to remain there at the scene?

20     A.    We were allowed to remain.

21     Q.    Okay.  Now do you recall one of the Silicon

22   Valley Animal Control Authority officers giving you a

23   document there at the scene?

24     A.    No, I don't.

25     Q.    Okay.  Let me just show you this document.

1    It's one page.  Just take a look at it and then I'll ask

2    you a few questions about it.

3           Now with regard to this document, it may have

4    originally been in two separate documents.

5        A.    Yeah, I understand.  This was given to us

6    later.  I don't think this was -- I believe this was the

7    document that they gave to us at a later date, not at

8    the time of the seizure.

9        Q.    All right.  Now let me just -- just so we're

10   clear, there is a document that's entitled Notice,

11   Seizure of Animals.  Do you see that?

12       A.    It's the heading.  That's the one I'm

13   referring to.

14       Q.    Right.  Okay.  Then there's another portion of

15   this single page that says Declaration of Ownership or

16   Right to Keep Animal.  Do you see that document?

17       A.    Yes, I do.

18       Q.    Okay.  Let's just deal with the Notice of

19   Seizure of Animals first.  Do you recognize any of the

20   handwriting on that document?

21       A.    No, I don't at all.

22       Q.    Okay.  Do you recall -- do you know what --

23       A.    You are talking about this one right here?

24       Q.    Yes, I am.

25       A.    No, I don't recognize that.

1     Q.    Do you recall receiving this document at any

2  time?

3     A.    No, I don't.

4     Q.    Okay.  Have you ever seen this document

5  before?

6     A.    No, I haven't.

7     Q.    Now let's take the other portion, the

8  Declaration of Ownership or Right to Keep Anim 

9  you ever seen this document before?

10     A.    Well, that's definitely my handwriti

11     Q.    Okay.  Which -- is all of the handwriting on

12  this portion of the document under Declaration of

13  Ownership or Right to Keep Animal, is that all of your

14  handwriting?

15     A.    No; only my signature there.

16     Q.    Is that your wife's signature there also?

17     A.    Yes, it is.

18     Q.    Okay.  Do you remember seeing this document

19  before?

20     A.    No, I don't.

21     Q.    Okay.  Do you recognize the other handwriting

22  that's on this portion?

23     A.    Correct.

24     Q.    Whose is it?

25     A.    My wife's.

1  Q. Which areas of this document has your wife's

2 handwriting?

3  A. The upper right-hand portion of the document.

4  Q. Okay.  Where I believe -- can you read that

5 for me?

6  A. Please make this --

7  Q. Hearing?

8  A. -- hearing as soon as possible.  That's the

9 declaration of a hearing that they were going to conduct

10 or did conduct.

11  Q. Okay.  All right.

12  A. And I do recognize that document.

13  Q. All right.  And you have seen it before?

14  A. Yes.

15  Q. And do you remember when you first received

16 this document?

17  A. We went to the animal control place where

18 their offices were and got it there.

19  Q. Okay.  When was that?  Again if this incident

20 takes place on December 19, when did you receive this as

21 best you recall?

22  A. I can't specifically say that.  I don't know

23 what date it was.  I know it was later.  From the

24 document here it had to be returned to them by the 29th,

25 so --.

1      Q.    All right.  Do you recall having a hearing

2   regarding the seizure of your animals?

3      A.    Yes, I do recall a hearing; yes.

4      Q.    Did you receive this document before the

5   hearing took place?

6      A.    Yes.

7      Q.    Did you understand that this was a document so

8   that you could request a hearing?

9      A.    Yes.

10     Q.    Okay.  Why don't -- we're going to mark the

11  single page which has the document or the document

12  Notice Seizure of Animals and Declaration of Ownership

13  or Right to Keep Animal as Defendant's next in order.  I

14  think it's I.

15          (Exhibit I was marked for identification.)

16          MR. HAZELWOOD:  Q.  Sitting here today,

17  Mr. Jackson, do you recall whether you received either

18  of those two documents that we marked as Exhibit I on

19  the day that the incident occurred?

20     A.    The one I mentioned specifically earlier, yes.

21  This one here I do not recall.

22     Q.    Okay.  So the Declaration that we talked

23  about, you think you got on the day of the incident?

24     A.    Either later on the same day or the next day

25  we went over to the office.  I don't think it was the

1   same day.

2      Q.    All right.  The Notice of Seizure of Animals,

3   you don't recall seeing that before?

4      A.    I do not recall that.

5      Q.    Okay.  All right.  So then a hearing was set,

6   and my understanding is that took place three days later

7   on December 22nd, 2005.  Does that sound right to you?

8      A.    Yes.

9      Q.    Okay.  Did you receive notice either in

10  writing or by a telephone call that the hearing was

11  going to go forward?

12     A.    Yes.

13     Q.    Okay.  How did you become aware of the

14  hearing?

15     A.    I think it was by writing.

16     Q.    Okay.  Let me show you a letter from the

17  Silicon Valley Animal Control Authority to Mr. and

18  Mrs. Kenneth Jackson dated December 21, 2005.  I want to

19  ask if you have seen that letter before?

20          MS. FREEDMAN:  I'm sorry, what was the date of

21  the letter?

22          MR. HAZELWOOD:  December 21, 2005.

23          THE WITNESS:  Yes.

24          MR. HAZELWOOD:  Q.  Is this the notice that

25  you received?

1    A.    Yes.  We did receive that.

2    Q.    All right.  And did you receive this in

3 advance of the hearing?

4    A.    Yes.

5    Q.    Okay.  Let's mark that as Exhibit J.

6          (Exhibit J was marked for identification.)

7          MR. HAZELWOOD:  Q.  All right.  So then did

8 you and your wife go to the hearing?

9    A.    Yes.

10   Q.    And where was the hearing held?

11   A.    At their offices.

12   Q.    Of Silicon Valley?

13   A.    Of Silicon Valley Animal Control offices.

14   Q.    Okay.  Did both you and your wife go?

15   A.    Yes.

16   Q.    Did you have counsel with you?

17   A.    No.

18   Q.    Did you have anyone else attend on your

19 behalf?

20   A.    There were a couple of people in support of

21 us, but nobody appeared on our behalf.

22   Q.    I see.  Who was there in support?

23   A.    Mr. Mark Butler.

24   Q.    Who is he?

25   A.    He's an Assistant District Attorney, Santa

1     Clara County.

2          Q.    All right.

3          A.    And Judy Kucera.

4          Q.    Did they speak at the hearing?

5          A.    No, they did not.

6          Q.    What took place at the hearing?

7          A.    It was an in-house hearing, and there was no

8     proper judge.  There was a hearing officer from the

9     Campbell Police Department.

10         Q.    That was Captain Russ Patterson?

11         A.    Yes.

12         Q.    Why do you say he wasn't proper?

13         A.    As far as I know he's not a judge.

14         Q.    Do you have some understanding that the person

15    who is conducting the hearing or overseeing the hearing

16    has to be a judge?

17         A.    I believe he should have been; yes.

18         Q.    Who told you that?

19         A.    My wife told that to me, and somebody told

20    that to her.

21         Q.    Do you know who told her?

22         A.    No.

23         Q.    Okay.  Did you and your wife speak at the

24    hearing?

25         A.    My wife did.

1    Q.   Did you have the opportunity to speak?

2    A.   Yes.  I guess I could have.  Yes, I did ask a

3 couple of questions.

4    Q.   Did you choose to have your wife speak on your

5 behalf?

6    A.   Yes, she spoke.  Yes, she did speak.

7    Q.   All right.  How long was the hearing?

8    A.   Less than half an hour.

9    Q.   Who else was there?

10   A.   Antje Morris was there, Mr. Davis was there.

11 And the director of the Animal Control Authority.  I

12 don't know his name.

13   Q.   Dan Sazinski?  Do you recognize that name?

14   A.   Yes; that's he.

15   Q.   Anybody else there?

16   A.   No.

17   Q.   Okay.  Did you receive the decision that day

18 with regard to the hearing?

19   A.   I don't think it was the same day.  I think it

20 was maybe the next day, I think.

21   Q.   What did you understand the hearing was about?

22   A.   About whether they were going to seize our

23 animals or not.

24   Q.   Did you understand that the hearing was about

25 whether -- well, the animals had been seized; correct?

1      A.    Well, whether they were going to be kept.

2      Q.    Okay.  All right.  And is it your recollection

3  you did not receive a decision that day?

4      A.    That is my recollection; yes.

5      Q.    How did you learn about the decision?

6      A.    By mail.

7      Q.    By mail?

8      A.    (Witness nods head.)

9      Q.    Do you recall Captain Patterson advising you

10  orally at the hearing that he felt that the impoundment

11  of the animals was proper and justified?

12      A.    Yes.  Yes, I do remember that.

13      Q.    Okay.  And then did you receive a letter in

14  follow-up from Captain Patterson?

15      A.    Yes.

16      Q.    Okay.  Let me show you a letter dated

17  December 22nd, 2005, from the City of Campbell Police

18  Department.  Do you recognize that letter?

19      A.    I don't think I personally saw it, but I'm

20  sure it's accurate.

21      Q.    But you don't recall one way or the other --

22      A.    I don't recall having personally read it, but

23  I know it's accurate.

24      Q.    What's accurate?

25      A.    The letter itself.

1      Q.    Okay.  Do you recall --

2      A.    My wife opened it, I'm sure, and read it and

3  told me about it.

4      Q.    Do you believe this is the letter that you

5  received?

6      A.    It's legitimate and it's accurate, I'm sure.

7      Q.    Do you believe this is the letter that you

8  received?

9      A.    Yes.

10      Q.    All right.  We'll mark this as Exhibit K.

11            (Exhibit K was marked for identification.)

12            MR. HAZELWOOD:  Q.  All right.  Let me show

13  you another document.  It's a two-page document entitled

14  Findings in Support of Decision Affirming Seizure and

15  Impoundment.  I just want to ask you if you have ever

16  seen this document before?

17      A.    Yes, I have seen it.

18      Q.    When do you recall -- do you recall receiving

19  this at some point in time in the mail, or --?

20      A.    No; I don't recall -- it must have been in the

21  mail.  I'm sure it was.

22      Q.    Do you remember when in relation to the

23  hearing that you would have received this?

24      A.    No, I don't.

25      Q.    All right.  Let me go ahead and mark this as

1  cat was in?

2      A.    I would say about three feet by five feet.

3      Q.    Okay.  Number 12, litter boxes contained large

4  amounts of fecal matter.

5      A.    I do not challenge that.  I hadn't cleaned up

6  that day.

7      Q.    Number 13, the water bowls inside the cat

8  condos were either empty or barely filled with water.

9  Correct or incorrect?

10     A.    I challenge that.

11     Q.    Why?

12     A.    Because I don't believe they were.

13     Q.    Number 14, the cats appeared to have health

14  problems, shriveled ears, and missing fur.

15     A.    I don't know.  I challenge that.

16     Q.    But you don't know one way or the other?

17     A.    I don't recognize any shriveled ears at all.

18  And as far as the missing fur, I don't recognize that

19  either.

20     Q.    Okay.  Number 15, some of the cats displayed

21  signs of upper respiratory infection including sneezing

22  and discharge from the eyes and nose.

23     A.    I don't know.

24     Q.    Okay.  All right.  Let me show you a further

25  letter.  This one is from Silicon Valley Animal Control

1    Authority dated December 22nd, 2005.  It's a two-page

2    letter from Albert Davis.  Why don't you just take a

3    look at it, and my question will be have you seen this

4    letter before?  Have you seen this document before?

5        A.    Yes.

6        Q.    Okay.  Did you receive this letter by mail?

7        A.    Yes.

8        Q.    Okay.  And what did you understand from

9    letter?  What was --

10        A.    If I understood it, we could receive on

11    back.  I don't think it mentions the name of the

12    here.

13        Q.    I think it says Justice.

14        A.    Justice.  Upon payment of $7,000.

15        Q.    And some other --

16        A.    I think that --

17        Q.    -- steps --

18        A.    I think --

19        Q.    -- that are noted on the bottom of page 1?

20        A.    Yeah, and subsequent comments from them.  We

21    were told $7,000.

22        Q.    Okay.  Now in follow up to receiving this

23    letter did you have a further or did you have a meeting

24    with the Silicon Valley Animal Control Authority staff?

25        A.    No.

1    decision that we talked about and the letter that we

2    have marked -- or actually we will mark -- let's do that

3    right now.  We're going to mark that letter of

4    December 22nd, 2005, from Silicon Valley Animal Control

5    facility as Defendant's next in order.  I think that's

6    M.

7            (Exhibit M was marked for identification.)

8            MR. HAZELWOOD:  Q.  After receiving the

9    decision, the hearing decision and this letter of

10   December 22nd, 2005, did you and your wife take any

11   steps to get the dog back, to get Justice back?

12       A.    No.

13       Q.    Did you take any steps to comply with what was

14   requested in this letter under numbers 1 through 7?

15           MR. WILSON:  Could we have a copy of that?

16           MR. HAZELWOOD:  Oh, I'm sorry.

17           THE WITNESS:  Oh, yes, we certainly did.  I

18   mean, we cleaned the place up and straightened it up.  I

19   mean, some of this wouldn't be applicable to --.  My

20   wife went to a meeting of the City Council and was told

21   by the Assistant City Manager if we would pay the $7,000

22   we could have Justice back.

23       Q.    Okay.

24       A.    And my wife --

25       Q.    When was that?

1    A.    From our attorney.

2    Q.    I don't want to know anything that you talked

3  about with your attorney.  All right.  Do you know why

4  the animals were put to sleep?

5    A.    No, I don't.

6    Q.    Since the seizure took place back on

7  December 19, 2005, have you obtained or taken in other

8  animals?

9    A.    One little dog.

10    Q.    Is that the only animal that you're keeping in

11  the motorhome?

12    A.    And one little cat.

13    Q.    What's the name of the dog?

14    A.    I am getting a mental blank here.  I'm --

15  Nikkilinn.  I'm not sure of the way she spells that.

16  N-i-k-k-i-l-i-n-n, I think.

17    Q.    Okay.  What kind of dog is it?

18    A.    It's a Pomeranian.

19    Q.    How old is the dog?

20    A.    Two years old.

21    Q.    Where did you get the dog?

22    A.    My wife was in the hospital.  A lady brought

23  her to the hospital.  She felt that -- some people that

24  were her neighbors had abandoned the dog here in

25  California.  They had moved back to Georgia and just

1   left it here.  And she was going to keep it for her

2   grandson, but the little boy was a little rough on the

3   dog.  And she thought it might bring comfort to my wife.

4        Q.   And then how long have you had -- what is the

5   cat's name, I'm sorry?

6        A.   Let me think for a minute.  I'm drawing a

7   blank here now.  I can't recall the cat's name.  I'm

8   having a total blank here.

9        Q.   How long have you had the cat?

10       A.   We've had the cat about two years.

11       Q.   Where did you get the cat?

12       A.   I can't remember.

13       Q.   Did you -- was it taken in as a stray?

14       A.   No, it wasn't a stray.  I can't remember.

15       Q.   All right.  Do you have a plan -- is there a

16   thought to obtain more animals at this time?

17       A.   Absolutely not.

18       Q.   After the incident that we have been talking

19   about, did your wife require any type of medical

20   treatment of any kind?

21       A.   She tried to get some psychological help

22   because of her continuing negative -- not negative.

23   What am I saying here.  My mind is leaving me now.

24       Q.   That's okay.  Take your time.

25       A.   Depression.  Constant depression.  Constant

1   incurred in caring for your animals.  Do you see that

2   sentence?

3       A.    Yes.

4       Q.    And what was your understanding of what that

5   meant?

6       A.    Well, it's pretty self-evident, I think.

7       Q.    Did you reimburse the Humane Society for the

8   veterinary expenses incurred in caring for the animals?

9       A.    No.

10      Q.    Why not?

11      A.    Because I was unable to.  Or I should have

12   said I would have been unable to.

13      Q.    Can you describe for me what contact you had

14   with the Humane Society after the seizure?

15      A.    I've had no contact whatsoever.  I did go to

16   the Humane Society several days in a row looking for one

17   of our animals in case they had been put up for

18   adoption.

19      Q.    Do you recall when that was?

20      A.    Just maybe a week after they had been taken.

21   I don't remember the specific dates.  But it would be

22   immediately prior to and immediately after Christmas

23   day, I would think.

24      Q.    While you were there did you speak with

25   anyone?

FS-005

# NOTICE
## SEIZURE OF ANIMAL(S)

Silico___ alley Animal Control Authority
2324 Walsh Avenue
Santa Clara, CA 95051
Tel. (408) 764-0344 Fax. (408) 988-5411

Date: 12/12/05    Time: 4:15 pm    Case # A05-12-2593

Under the authority of Penal Code Section 597.1, the animal(s) described below was/were seized in violation of the following:

Code Sections: California Penal Code 597(b)

___ on: Mervyn Place Parking Lot - El Camino Real

City: Santa Clara  CA  95050

Address/Location

Zip

Animal(s)/ID: 6 adult dogs - Lhasa Apso, Shih Tzu, Lab

15 adult cats

Circumstances: Unsanitary living condition inside

Mobile home, too many animals

Ticer: A. Harris H6    Extension: 764-0344

**Statement:** The owner or person authorized to keep the animal(s) or his/her agent may request a post-seizure hearing by returning the enclosed declaration within ten days, including holidays/weekends, of the Notice date. Return the declaration by personal delivery or mail.

**Statement:** Costs for care/treatment of animal(s) properly seized are liens against the animal(s). No animal will be returned until liens are paid. Failure to request or attend a scheduled hearing shall result in liability for the costs.



EXHIBIT I
Deponent: M. Jackson
Date: 6-11-08   Rptr. me
WWW.DEPOBOOK.COM

---

Silicon Valley Animal Control Authority
Tel. (40_) 764-0344

### Declaration of Ownership or Right to Keep Animal

☑ I am the Owner  please make this hearing as soon as possible

☐ I am the Person Authorized to Keep the Animal   I love my animals and

☐ I am the Agent of the Owner   they love me

☐ I am the Agent of the Person Authorized to Keep the Animal

I hereby request that you schedule a pre-seizure/post-seizure hearing.

This declaration must be returned to SVACA by  AVHC 5:00 Pm
(Time)

on 12/29/05 unless you wish to waive your right to a hearing.

Signature: Lee Jackson  Ken Jackson   Print Name Lee Jackson  Ken Jackson

Address: PO Box 958 Gilroy, Ca, 95021-

Hm. Phone 408-832-1311   Wk. Phone we don't pick up mail

Please notify us of date by phone   mail daily pick ups of gas



# Silicon Valley
## Animal Control Authority

Serving

Campbell

Monte Sereno

Santa Clara

December 21, 2005

Mr. & Mrs. Kenneth Jackson
P.O. Box 958
Gilroy, CA 95021

Re:    Summary seizure and post-seizure hearing
       Date: December 22, 2005
       Time: 9:00 am

Dear Mr. & Mrs. Jackson:

The hearing has been set for the above-referenced date and time and will be held at the
Silicon Valley Animal Control Authority office, 2324 Walsh Ave., Santa Clara, CA 95051.
Please check in at the front counter.

Sincerely,

Albert J. Davis
Field Services Manager

cc:    City of Santa Clara, City Attorney's Office
       Captain Russ Patterson, Campbell Police, Hearing Officer

EXHIBIT J
Deponent Jackson
Date 6-11-08 Rptr. ane
WWW.DEPOBOOK.COM



# CITY OF CAMPBELL
### Police Department

December 22, 2005

Mr. and Mrs. Kenneth Jackson
P.O. Box 858
Gilroy, CA 95021

Dear Mr. and Mrs. Jackson:

Thank you for taking time to appear at the impoundment hearing held at the Silicon Valley Animal Control Authority offices on Thursday, December 22, 2005. This notice is to advise in writing of the decision that I made at this morning's hearing.

As I mentioned, I determined that the impoundment of your dogs and cats was proper and justified based on the information provided by Officer Morris. Should you have any additional questions, please contact Al Davis, SVACA's Field Services Manager, at (408) 744-0344.

Sincerely,

Russ Patterson
Captain, Campbell Police Department
SVACA Hearing Officer

cc:    Al Davis, SVACA

EXHIBIT K
Deponent
Date 6-11-08    Rptr
WWW.DEPOBOOK.COM



# Silicon Valley
## Animal Control Authority

December 22, 2005

Serving

Campbell

Monte Sereno

Santa Clara

Mr. & Mrs. Kenneth Jackson
P.O. Box 958
Gilroy, CA  95021

Dear Mr. & Mrs. Jackson:

This is in regard to your animals that were lawfully seized from your vehicle on December 19, 2005.  The animals were suffering unnecessarily from a lack of proper air, veterinary care, and proper space.  This neglect of animals violates California anti-cruelty laws.

Please be advised that as an animal owner in the State of California, you are required to provide animals with proper food, drink, shelter, and to protect them from needless suffering or unnecessary cruelty.  Failure to provide such care is a violation of Penal Code 597(b) of the California Penal Code, entitled "Crimes Against Animals," and is punishable as a misdemeanor or as a felony or alternatively punishable as a misdemeanor or a felony and by a fine of not more than twenty thousand dollars ($20,000).

You were also in violation of the City of Santa Clara animal ordinances as your dogs were not vaccinated and licensed.  You also violated the "over-the-limit" animal ordinance.

SVACA will consider returning "Justice" a neutered, black Labrador mix to you if you correct the violations of law.  Specifically, you must pay all required fees and demonstrate to the satisfaction of SVACA that you can and will provide the necessary care required by 5:00pm Thursday January 5, 2006. Failure to do so will result in "Justice" and all animals being deemed abandoned and therefore disposed of by SVACA.  Please contact SVACA when you are ready for a reinspection.

In order to provide necessary care you must do the following:

1. Provide proper food:
   a. Provide proper, wholesome food. Your dog should be fed daily with the correct quantity (refer to your veterinarian's recommendation – or table on the back of the dog food bag);
   b. Provide proper food in a clean, adequately sized container;
   c. Two 50 lb. bags must be available upon reinspection.

2. Provide proper water:
   a. Provide a large, sturdy water container to ensure your dog has access to water at all times.

EXHIBIT
Deponent Jackson
Date 6/1/6   Rptr me
WWW.DEPOBOOK.COM

3. Provide proper air and space:
   a. Remove all waste matter causing odor. Clean the vehicle thoroughly and maintain in a clean and healthy manner.
   b. Provide proper space and confinement. Chaining is not an acceptable form of confinement as it can cause unnecessary suffering. Allow the dog to roam loose in the vehicle when not in motion and house in a properly sized crate when the vehicle is in motion.
   c. You must also properly exercise your dog. It is recommended that the dog be properly exercised (walked on leash for an extended period or exercised in a dog friendly area such as a dog park) at least twice a day.

4. Collars:
   a. Provide a properly fitted collar to prevent your dog from injury and unnecessary suffering. The existing collar (choke chain) is a training device and not intended for everyday use.

5. Veterinary Care:
   a. Provide proper veterinary care and follow all recommendations of a veterinarian.

6. You will allow SVACA to inspect your vehicle and new premises for compliance at any time.

7. You will not violate the "over-the-limit" animal ordinance. It is strongly recommended that you own only one animal until you have a permanent address and can therefore provide proper care for more than one animal.

In addition, you will be required to pay all SVACA fees. As of today, fees owed total $2,603.00.00 and will continue to accrue at a rate of $299.00 per day. You must also reimburse the Humane Society for any and all veterinary expenses incurred in caring for your animals.

If you are unable to pay the required fees and/or provide the necessary care required, it is recommended that you surrender your animal as soon as possible to SVACA.

Please contact me at 764-0344 if you have any questions.

Sincerely,

Albert J. Davis
Field Services Manager

1           R E P O R T E R ' S   C E R T I F I C A T E

2

3           I, MARSHA SIMPSON, a Certified Shorthand

4    Reporter of the State of California, hereby certify that

5    the witness in the foregoing deposition was by me duly

6    sworn to tell the truth, the whole truth and nothing but

7    the truth in the within-entitled cause; that said

8    deposition was taken at the time and place therein

9    stated; that the testimony of the said witness was

10   reported by me, a duly certified shorthand reporter, and

11   was thereafter transcribed by me or under my direction

12   into typewriting; and that the witness was given an

13   opportunity to read and, if necessary, correct said

14   deposition and to subscribe the same.

15           I FURTHER CERTIFY that I am not of counsel or

16   attorney for either or any of the parties in the

17   foregoing deposition and caption named, or in any way

18   interested in the outcome of the cause named in said

19   caption.

20           IN WITNESS WHEREOF, I have hereunto set my

21   hand this 12th day of June, 2008.

22

23   MARSHA SIMPSON
     Certified Shorthand Reporter
24   Certificate No. 2771
     State of California

25

EXHIBIT B

CERTIFIED COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---


LEE JACKSON and KENNETH JACKSON,

      Plaintiffs,

       vs.                No. C08-05667RS

SILICON VALLEY ANIMAL CONTROL
AUTHORITY; CITY OF SANTA CLARA;
CITY OF CAMPBELL; HUMANE SOCIETY
SILICON VALLEY and DOES 1 to 20,

      Defendants.

_____/


DEPOSITION OF LEOLA JACKSON

Wednesday, June 11, 2008

VOLUME I

ROOMIAN & ASSOCIATES
Reported by:                    Certified Shorthand Reporters
MARSHA SIMPSON                  225 Bush Street, Suite 348
CSR No. 2771                    San Francisco, CA 94104
                                   (415) 362-5920

1     A.    Okay.

2     Q.    Good.  All right.  Let me ask you some

3   background questions.  Can you give us your date of

4   birth, please?

5     A.    5-15-21.

6     Q.    And where were you born?

7     A.    Mount Ayr, Iowa.

8     Q.    And Ayr is A-y-r?

9     A.    A-y-r.

10    Q.    All right.  And my understanding from the

11  deposition of your husband earlier today is that you and

12  Ken have been married for over 43 years?

13    A.    Since 9-11-66.

14    Q.    All right.  And you have no children; correct?

15    A.    No.

16    Q.    All right.  And where do you currently reside?

17    A.    Well, we're temporarily in our motorhome.

18    Q.    And that's -- what is the year and make and

19  model of that motorhome?

20    A.    1996 Bounder.

21    Q.    Okay.

22    A.    Thirty-eight and a half foot.  It's the

23  biggest they make.

24    Q.    Okay.  How long have you had the motorhome?

25    A.    Since 2000.

1      Q.    And did you purchase that from Mr. Gonzalez?

2      A.    Yes.

3      Q.    Have you been using the motorhome as your

4   residence since 2000?

5      A.    Yes.

6      Q.    And where do you keep the motorhome at this

7   time?

8      A.    Well, my husband works part-time, as you know,

9   so we're there when he's working.  And sometimes if we

10  don't have something else to do, we stay there overnight

11  because of the cost of gasoline today.  So it depends

12  upon what our plans are as to where we are and where we

13  aren't.

14     Q.    My understanding is that he's been working for

15  the past four months or so at the Safeway store at

16  Rivermark Plaza in Santa Clara?

17     A.    Four months?  He'll be there three years in

18  September.

19     Q.    Okay.  That was my bad.  That's right.

20     A.    He started to work there September 25th, 2005.

21     Q.    Okay.  Prior to that he worked at Wal-Mart?

22     A.    He worked at Wal-Mart from -- he was there

23  nine and a half years.  He left there in February of

24  2005.  February 25th, as a matter of fact, the same day.

25  And the month.  February 25th, 2005, he left Wal-Mart.

1    us if we would park in certain areas to watch certain

2    places there, like maybe at the coin machine sometimes,

3    maybe the bicycles.  And of course this is only a

4    temporary situation.  And because of this --

5            MR. WILSON:  There's no question.

6            MR. HAZELWOOD:  Q.  Do you have any firm plans

7    at this point to move into another residence?

8        A.    When this matter is settled.

9        Q.    What does this matter have to do with whether

10   you move somewhere else or not?

11       A.    Because we have to stay close here in case if

12   we have to go to court or something.  We have to stay

13   close here.  I want to get out of the entire area.

14       Q.    Do you remember the date of the incident that

15   we're here about?

16       A.    December 19th, 2005.

17       Q.    All right.

18       A.    About 20 or 25 minutes to 1:00.

19       Q.    I didn't ask the time yet, but I was just

20   asking for the date.  Prior to that date had you ever

21   kept the motorhome overnight at the Mervyn's Plaza?

22       A.    Yes.

23       Q.    Okay.  How often had you done that?

24       A.    I couldn't answer that, the exact days that we

25   were there.

1    A.    No; this is a black smoke lop eared, Onyx,

2    rabbit that we rescued from a pet shop.

3    Q.    You and your husband did?

4    A.    Yes.

5    Q.    Okay.  All right.  Have you ever been

6    convicted of a felony?

7    A.    No.

8    Q.    And based upon your testimony -- Stuart, I

9    think it's the same deal, there's no wage loss claim or

10   loss of earning capacity claim in this case; is that

11   right?

12        MR. WILSON:  Yes.

13        MR. HAZELWOOD:  Okay.

14   Q.    All right.  We talked about the date of the

15   incident being December 19, 2005.  Do you remember what

16   day of the week that was?

17   A.    Monday.

18   Q.    And what time period did the events occur?

19   A.    Well, I previously told you that they came

20   about 25 until 1:00.  25, 20 minutes to 1:00.

21   Q.    Okay.  And where did these events take place?

22   A.    At the Boston Market parking lot.

23   Q.    Is that also where the Mervyn's is that we

24   talked about before?

25   A.    Yes.  It's across the street from Mervyn's.

1    We never did actually park in direct Mervyn's.

2        Q.    Okay.  And that's in the City of Santa Clara?

3        A.    Yes.

4        Q.    And up to that time what had you been doing

5    that day?

6        A.    Well, Ken had been working.

7        Q.    Okay.  At Safeway?

8        A.    Yes.

9        Q.    What hours was he working that day?

10       A.    7:00 to 11:00.  No; 7:00 to 12:00 that day.

11       Q.    And then he got off work at noon?

12       A.    Well, yes, he got out to the motorhome about

13   20, 25 minutes after 12:00, I guess.

14       Q.    And what had you been doing that day while he

15   was working?

16       A.    Well, I was very sick with bronchitis and on

17   antibiotics, and when he went to work that morning there

18   was —— when he opened the door there was a huge, huge

19   swarm of flies like bees came in.  For over two and a

20   half hours I'd been killing flies.  Apparently they had

21   put some horrible fertilizer on the plants there, and I

22   had been doing that in the morning.  I don't have flies

23   in my place, and I am very feisty (sic).

24       Q.    Where, specifically where had the motorhome

25   been parked that morning?

1   long did she remain there?

2       A.    Only a few seconds, just long enough to hand

3   me the gift.

4       Q.    And at that point who else was present there

5   when she came by?  Was your husband there?

6       A.    Well, I'm sure he was.

7       Q.    Okay.

8       A.    I'm trying to think if she was there when the

9   whole group was there or -- let me think back.  I think

10  she was just there when -- I really can't answer that.

11  I'm not sure.  I'm getting too upset.  I think that just

12  Morris was there at the time she came.

13      Q.    Antje Morris?

14      A.    Yes.

15      Q.    Okay.

16      A.    She was only there a brief second, just long

17  enough to hand me the gift.  I honestly can't answer

18  that directly, because I just --.

19      Q.    Okay.  All right.  So you went to the parking

20  lot that we've been talking about.  And at some point

21  were you then contacted by Officer Morris?

22      A.    Mr. Hazelwood, we no longer stopped until she

23  knocked on the door.

24      Q.    Okay.  So were you inside the motorhome?

25      A.    Yes.

1  Q.    You and your husband?

2  A.    I was still at the steering wheel when she

3  knocked on the door.

4  Q.    So how long had you been parked in the parking

5  lot?

6  A.    Well, maybe two minutes.  If that.  I'm sure

7  she followed us.

8  Q.    Okay.  And Officer Morris then knocked on the

9  door of the motorhome?

10  A.    Yes.

11  Q.    Okay.  Who answered the door?

12  A.    My husband.

13  Q.    Okay.  Had you ever seen or had contact with

14  Officer Morris before?

15  A.    No.

16  Q.    All right.  And did she identify herself?

17  A.    I don't remember if she said her name or not.

18  I knew it was the animal control by the truck.  My

19  husband called me to the door.  I don't remember her

20  stating her name at that time.

21  Q.    Did you have a conversation with her at that

22  point?

23  A.    I told her I'm on my way -- she said I'm here

24  to check your animals.  You're homeless.  And I said I'm

25  -- she was very nasty.  And I said I'm on my way to the

1  vet.  I have a sick little dog.  I do not have time to

2  talk to you now.  And she responded you're not going

3  anywhere.

4      Q.    Okay.  Anything else said at that point?

5      A.    No.

6      Q.    I'm sorry?

7      A.    No.

8      Q.    Okay.  Did she say that she had a call

9  concerning --

10     A.    No.

11     Q.    -- the condition of your animals?

12     A.    No.

13     Q.    All right.  Did she at that point ask if she

14  could inspect the motorhome at that point?

15     A.    No.

16     Q.    Did she ask if she could see your animals?

17     A.    No, not at that point.  I took, went and got

18  my little Shih Tzu and took it out and showed it to her.

19     Q.    Why did you do that?

20     A.    Just so she could see how nice my animals

21  were.  My animals were in beautiful condition.

22     Q.    Is this Calae?

23     A.    Calae.

24     Q.    Okay.  All right.  So you brought Calae out.

25  And did Officer Morris take a look at her?

1     A.    Fleeting glance.

2     Q.    Okay.  Did Calae have any physical problems at

3 that time?

4     A.    Calae was okay.  She had had a major surgery

5 in May.

6     Q.    Of what year?

7     A.    Of 2005.

8     Q.    Okay.  What kind of major surgery?

9     A.    She was spayed.

10     Q.    How old was Calae at that point?

11     A.    Calae was 15.

12     Q.    Okay.  So she was spayed at the age of 14 or

13 15?

14     A.    At 15.

15     Q.    Okay.  Where was she spayed at?

16     A.    Dr. Clay.

17     Q.    At Chanticleer?

18     A.    Yes.

19     Q.    Okay.  All right.  You said she had had major

20 surgery in May of '05 in which she was spayed.  Did she

21 have any physical problems as of the time that Officer

22 Morris was there that day, December 19?

23     A.    She was not sick at the time Officer Morris

24 was there.  She was scheduled to have a blood test to

25 see if there was anything happening.  She had breast

1    tumors that Dr. Clay would not do anything with because

2    of her age.  She had her teeth cleaned at the time of

3    the surgery and some teeth extracted.  And prior to that

4    she had had some type of a seizure, which we had taken

5    her to Dr. Clay and she had flipped out of her bed.  I

6    don't know if her jaw was broken then or when her teeth

7    were extracted.

8        Q.    She had a broken jaw?

9        A.    Yes, she did.  And I told Ms. Morris, Antje

10   Morris, that she had a broken jaw.

11       Q.    How long had she had the broken jaw?

12       A.    Well, maybe only four or five months; just a

13   short time.

14       Q.    Did she have any other physical problems as of

15   that time?

16       A.    No, no; she was fine.

17       Q.    I'm sorry, did she have any problems with her

18   eyesight?

19       A.    I think maybe she had some possible partial

20   blindness, which is normal in a dog of that age.

21       Q.    Did she have any dental problems as of that

22   date?

23       A.    I just told you that she had had dental work

24   and had some teeth extracted when she was operated on in

25   May.

1   poodles, and that's what you do.

2        Q.    Okay.  And did Minnilinn have any other

3   physical problems other than being in season?

4        A.    No.

5        Q.    Did she have any dental problems?

6        A.    No.  Her teeth were not in the condition that

7   Morris said they were.  And she hadn't had any epiletpic

8   attacks for over two years.  Because of our love it had

9   all stopped.

10       Q.    Did Officer Morris then look at Minnilinn?

11       A.    No different than she did Calae; just a

12  fleeting glance.  She never touched either one of them.

13  She just did a fleeting glance and that was it.  She was

14  there for a determined cause and that was all she was

15  after.

16       Q.    What do you mean by that?  What do you mean

17  she was there for a determined cause?

18       A.    I just don't think she has any love for

19  animals.

20       Q.    All right.  And after you brought Minnilinn

21  out, what happened next?

22       A.    When I carried Minnilinn back in,

23  Mr. Hazelwood, she followed me back in and forced

24  herself in the motorhome behind me.

25       Q.    Okay.  Did she just follow you right up ——

1    A.    Yes.

2    Q.    -- the stairs into the motorhome?

3    A.    Right.

4    Q.    Did she request to come in at any time?

5    A.    No.  I don't remember her saying anything.

6    She just followed right back in after me.

7    Q.    Did she say anything as she was doing so?

8    A.    I don't remember her saying anything.  I was

9    taking Minnilinn back to her basket, her bed.

10    Q.    All right.  So as far as you recall, there was

11    no conversation.  She just followed you in?

12    A.    Right.

13    Q.    Did you say anything to the effect of I don't

14    want you to come in, or did you try to stop her from

15    coming in?

16    A.    I had Minnilinn in my hands.

17    Q.    Okay.

18    A.    Minnilinn was not feeling well, and I was

19    taking her back to her bed.  My concern was Minnilinn,

20    not her.

21    Q.    Okay.

22    A.    My animals are first in everything.

23    Q.    Okay.  You say that she forced her way in.

24    Was there some objection by you, either physically or

25    orally, to her coming in?

1    A.    Well, I didn't invite her in.  She just

2  followed me in.

3    Q.    Okay.  But you didn't physically try to

4  prevent her from coming in at that point?

5    A.    I had Minnilinn in my arms.  I was carrying

6  her to her bed.

7        MR. WILSON:  Just listen to the question.

8        MR. HAZELWOOD:  Q.  Just answer the question.

9    A.    No.

10    Q.    So is the answer no?  Let me ask the question

11  again, okay.  When this was occurring, did you attempt

12  to prevent Officer Morris from coming in?

13    A.    No, because I had Minnilinn in my arms.

14    Q.    All right.  Did you tell her at this point

15  that you didn't want her to come in?

16    A.    She was already in.

17    Q.    Okay.

18        MR. WILSON:  Listen to the question and just

19  answer the question.

20        MR. HAZELWOOD:  Q.  At some point did you tell

21  her that you didn't want her to come in?

22    A.    No.

23    Q.    Okay.  Where was your husband when this was

24  going on?

25    A.    He was sitting in the chair by the door.

1    Q.    Did your wife follow her?

2    A.    My wife turned and watched her go in.

3    Q.    Okay.

4    A.    And she came out almost immediately, really.

5 It was a matter of moments.

6    Q.    Then what took place?

7    A.    Then cars descended, police cars descwended on

8 us.  Animal control cars.  Mr. Davis came to the door.

9 Police came to the door.  They hauled my wife off and

10 put her in a patrol car.  No, not -- wait a minute.  I'm

11 wrong there.  Mr. Davis tried to get in.

12    Q.    Let's take these one at a time; okay?

13    A.    Okay.

14    Q.    All right.  So Ms. or Officer Morris came back

15 out of the motorhome?

16    A.    She got on the phone.

17    Q.    You saw her get on the phone?

18    A.    She got on the phone and within moments --

19    Q.    So she got on the phone in your presence?

20    A.    In my wife's presence.  I didn't notice her

21 being on the phone.  I didn't notice that at all.  But

22 -- I was looking around.  But my wife told me that she

23 had phoned somebody.  And within moments the police

24 came, three or four police cars, and the animal control

25 cars.  At least two trucks came.

1    Q.   All right.  So a phone call was made.  And

2   then who arrived first, the City of Santa Clara officers

3   or the Silicon Valley Animal Control Authority?

4    A.   I don't know.  I think it was simultaneously

5   almost, really.

6    Q.   And how many City of Santa Clara officers?

7    A.   Three or four.

8    Q.   Okay.  Then how many additional employees or

9   officers from Silicon Valley Animal Control?

10    A.   In addition to Antje?

11    Q.   Yes.

12    A.   At least two.

13    Q.   One was --

14    A.   Mr. Davis was one of them.

15    Q.   Okay.  And you think there was one other

16   person?

17    A.   Debbie was there, too.  She could have been

18   there prior to that time.

19    Q.   This was the same Debbie that had seen you two

20   years before?

21    A.   Yes.  My wife had asked Antje where Debbie

22   was, and she said she was out of town.  But she did show

23   up.

24    Q.   Okay.

25         MR. WILSON:  Antje said Debbie was out of

1    He said that should be 20-foot commercial.  So then they

2    wouldn't change it, so I called Ron Garrett, the

3    Assistant City Manager, and I said that's elder abuse.

4    And he set the trap for me to take my animals for spite.

5        Q.    Okay.

6        A.    It was a trap.

7        Q.    All right.  At the time that the events of

8    December 19, 2005, occurred, how many animals were you

9    keeping inside of the motorhome?

10        A.    I had 15 cats and six dogs.

11            Okay.  All right.  And we have marked -- or

12    let's mark as an exhibit to this deposition -- let's

13    mark as Exhibit N to this deposition a Notice of

14    Deposition.

15            (Exhibit N was marked for identification.)

16            MR. HAZELWOOD:  Q.  This morning at your

17    husband's deposition we marked a document as Exhibit B

18    that's entitled an Inventory List.  This was prepared

19    either by the Silicon Valley Animal Control Authority or

20    the Humane Society.  And I want to show this to you,

21    not for all of the information that's on there but just

22    to get the names of the animals and make sure we have

23    them correct; okay.  So I'd like you to just take a look

24    at the document, and then I'm going to ask you about the

25    names.  Let me know --

1    A.   I can tell you right now.

2    Q.   -- when you are ready.  All right.  Have you

3  had a chance to look at the document?

4    A.   I have seen the document before.

5    Q.   Okay.  Great.  Is it correct that as of the

6  time -- as of December 19, you had six dogs and 15 cats?

7    A.   That's what I said.

8    Q.   Okay.  And are the names of the dogs correct

9  here?

10    A.   No.

11    Q.   How are they incorrect?

12    A.   They are not spelled properly, and I spelled

13  them for her.

14    Q.   Tell me --

15    A.   Calae is C-a-l-a-e.

16    Q.   Okay.  Anything else with regard to the dogs?

17    A.   Yes.  Brandy is a male dog, not a female, and

18  you never spell a male dog with an I on the end of it.

19  It's B-r-a-n-d-y.

20    Q.   And, I'm sorry, Brandy is a male or female?

21    A.   Brandy is a male, and she's got him as a

22  female.  Brandy with a female is I; with a male it's Y.

23    Q.   Okay.  Anything else wrong with --

24    A.   Kahlua, she's got K-a-l-u-a.  Her name is

25  K-a-h-l-u-a.

1  Q. Okay.

2  A. Shalaan is proper.  Kat—Chee and Kat—Chaa are

3 supposed to have a hyphen, but that's immaterial.

4  Q. I haven't asked you about the cats yet.

5  A. I thought you just wanted me to go straight

6 down.  Excuse me.

7  Q. It's all right.  Is Minnilinn correct?

8  A. Yes.

9  Q. Is Justice correct?

10  A. Yes.

11  Q. Okay.  Now you can tell me about the cats.

12  A. Minnilinn is supposed to be all one word, and

13 she's got it hyphenated, but that's immaterial.

14  Q. Okay.  How about the cats then?

15  A. The cats are —— well, Minnilinn is

16 M—i—n—n—i—l—i—n—n, not a capital L or dot or dash.  It's

17 all one word for the dog.

18  Q. Right.

19  A. Now we will go down to the cats.  Kat—Chee is

20 capital K—a—t dash capital C—h—e—e.

21  Q. Okay.

22  A. Kat—Chaa, capital K—a—t dash capital C—h—a—a.

23 Kalli—Kat is correct.  Kelli—Kat is correct.  Dinka is

24 correct.  Danaka is correct.  And here's where we come

25 in with a problem.  She has Kat—Chum down here, which is

1    correct, but when I got my papers from the Humane

2    Society they have got him listed as Twinkle Toes.

3             MR. WILSON:  He's just asking about this.

4             THE WITNESS:  Well, I have to make that

5    correction.

6             MR. HAZELWOOD:  I understand.  And I

7    recognized that also.

8             THE WITNESS:  Okay.

9             MR. HAZELWOOD:  Q.  I didn't know if it was

10   Twinkle Toes or Twinkie.

11       A.    No; Kat—Chum is his real name.  Katrinka is

12   correct.  The next one is not Krisco; it's Kisco,

13   K—i—s—c—o.  Kalee is correct.  Kitja is correct.  Sunery

14   is not Sunery.  I spelled it for her.  It's

15   S—u—n—a—r—e—e.  Sunaree, not Sunery.  Katja is correct.

16   Talia is correct.  And Kalliope is correct.

17       Q.    Okay.  Thank you.  Thank you.  Did you

18   consider yourself the owner of all of these animals?

19       A.    Yes.

20       Q.    This morning your husband told us that at

21   least he didn't consider you guys to be the owners of

22   the two feral cats.

23       A.    Well, I had just rescued those in June, and I

24   was going to as soon as they were such that I could take

25   them to the vet to get spayed, checked for leukemia and

1  these nasty photographs, and this, and I don't know what

2  all.  The pages where the writing, that maybe that you

3  have there.  I could have brought them in, but I didn't

4  know it was necessary for me to bring them in.  She had

5  them all in a package together.

6      Q.    So it's your testimony here today that this

7  Notice Seizure of Animals was handed to you after the

8  hearing of December 22nd?

9      A.    Yes.

10     Q.    Okay.

11     A.    By Morris.

12     Q.    By Antje Morris?

13     A.    Yes.

14     Q.    All right.  Now I'm going to ask you about the

15 other part of this document that's been marked as

16 Exhibit I.  Have you seen this document before?

17     A.    Oh, well, this was right together, right

18 together like this.

19     Q.    All right.

20     A.    They were -- both of these documents I

21 received that day.

22     Q.    After the hearing?

23     A.    After the hearing.

24     Q.    Okay.  Is that your signature --

25     A.    Yes, it is.

1    A.    Yes.  Please make the hearing as soon as

2  possible.  I love my animals and they love me.

3    Q.    Okay.

4    A.    Well, then, she gave this to me prior to the

5  hearing.  She brought it to me at McDonald's, sir.  We

6  parked along on El Camino.  And she handed it to me.

7  Maybe it was prior to the hearing.  But she gave it to

8  me in person at McDonald's.  I stopped right along

9  McDonald's, and she walked up beside me in front of me,

10  got out of the car and brought this back and gave it to

11  me.

12    Q.    So now you are saying it was not after the

13  hearing?

14    A.    I'm not sure.  I know I have the document, and

15  I know she gave it to me in person.  It was not mailed

16  to me.

17    Q.    And what day was that?

18    A.    This is very frustrating to me, this whole

19  thing.  I love my animals, and to relive all of this

20  from their cruelty is unbelievable.

21        I couldn't tell you what day.  I actually

22  thought it was the day of the hearing, I will have to

23  tell you that.  I know the hearing was on December 22nd.

24  And I know that she brought the document to me.  We

25  parked on El Camino.  She parked in front of me at

1    McDonald's and she carried it back to the car.  But I

2    think there was another one there that was talking

3    something about food or something.  I don't remember.

4        Q.    But you don't know what day that was?

5        A.    She had two or three things in the same thing.

6              MR. WILSON:  He's asking if you knew what day

7    it was.

8              THE WITNESS:  No, I don't.  I'm sorry.

9              MR. HAZELWOOD:  Q.  Now the handwriting below

10   at the bottom of this document, is that your handwriting

11   also?

12       A.    Down here, sir?

13       Q.    Yes.

14       A.    All the handwriting on there is mine.

15       Q.    Except for the signature of your husband?

16       A.    Yes.

17       Q.    Okay.  What does it say down at the bottom

18   below the phone numbers?

19       A.    Please notify me as of the date by phone.  We

20   don't pick up our mail daily.

21             That's right.  We don't pick up our mail

22   daily, and for them to notify me by phone.

23       Q.    What else does it say after daily?

24       A.    Because of --

25       Q.    Gas prices?

1    A.    Gas prices, uh-huh.

2    Q.    All right.

3    A.    It's sort of scribbled, because that's not the

4 way I hand write.

5    Q.    But it is your handwriting?

6    A.    Yes, it is.  I did write that, Mr. Hazelwood.

7    Q.    Okay.  All right.  And then -- so you

8 requested a hearing; correct?

9    A.    Yes, I requested a hearing.

10    Q.    All right.

11    A.    I mean, they said they would have a hearing.

12 I didn't specially request it.  They did not have the

13 proper hearing.  Yes.  Just -- sorry.

14    Q.    All right.  Let me show you a document that

15 was marked as Exhibit J to your husband's deposition.

16 It's a letter dated December 21, 2005, from Albert

17 Davis.  Have you seen that letter before?

18    A.    Yes, and I think this -- and I can't tell you

19 when we got all these documents.  This could have been

20 one that she delivered with that.

21    MR. WILSON:  Wait, wait, wait.  He just asked

22 if you have seen this.

23    THE WITNESS:  Yes, I have seen this.

24    MR. HAZELWOOD:  Q.  Did you receive this

25 document prior to the hearing?

1     A.    Yes.  And Mark said give her back some of her

2  animals.  And he said no, she won't get any of them.

3     Q.    Let me show you what was marked as Exhibit K

4  to Mr. Jackson's deposition.  This is a letter dated

5  December 22nd, 2005, from the City of Campbell Police

6  Department.  Did you receive that letter in the mail?

7  Or in some fashion?

8     A.    We received it at some time.  I have it in my

9  possession; yes.

10     Q.    Okay.  Let me show you what we marked as

11  Exhibit L to your husband's deposition.  This is a

12  two-page document titled Findings in Support of Decision

13  Affirming Seizure and Impoundment.  I want to ask you if

14  you have seen that before?

15     A.    I really don't remember this, but it could

16  have been that it did come with the others.  Because I

17  was in such a distraught -- I was so emotionally upset.

18  I would have to look at my papers.

19     Q.    Have you given all of your papers relating to

20  this incident to your attorney?

21     A.    Yes.  He has them all.

22     Q.    All right.

23     A.    He has it all.  I think I remember this up

24  here, but I don't remember reading any of this.  Because

25  I think I remember this title, but I don't remember

1        R E P O R T E R ' S   C E R T I F I C A T E

2

3        I, MARSHA SIMPSON, a Certified Shorthand

4   Reporter of the State of California, hereby certify that

5   the witness in the foregoing deposition was by me duly

6   sworn to tell the truth, the whole truth and nothing but

7   the truth in the within-entitled cause; that said

8   deposition was taken at the time and place therein

9   stated; that the testimony of the said witness was

10  reported by me, a duly certified shorthand reporter, and

11  was thereafter transcribed by me or under my direction

12  into typewriting; and that the witness was given an

13  opportunity to read and, if necessary, correct said

14  deposition and to subscribe the same.

15        I FURTHER CERTIFY that I am not of counsel or

16  attorney for either or any of the parties in the

17  foregoing deposition and caption named, or in any way

18  interested in the outcome of the cause named in said

19  caption.

20        IN WITNESS WHEREOF, I have hereunto set my

21  hand this 13th day of June, 2008.

22

23  MARSHA SIMPSON
    Certified Shorthand Reporter
24  Certificate No. 2771
    State of California

25